# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

---------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: TRANSPERFECT GLOBAL, INC. | ) | C.A. No. 9700-CB |
| | ) | |
| | ) | |
| ELIZABETH ELTING, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 10449-CB |
| | ) | |
| PHILIP R. SHAWE and SHIRLEY SHAWE, | ) | |
| Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TRANSPERFECT GLOBAL, INC. | ) | |
| Nominal Party. | ) | |

---------------------------------------------------------

## MEMORANDUM OPINION

Date Submitted:  March 2, 2021
Date Decided:  April 30, 2021

Kevin R. Shannon, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philip S. Kaufman, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York; *Attorneys for Elizabeth Elting.*

Jeremy D. Eicher, EICHER LAW LLC, Wilmington, Delaware; David B. Goldstein, RABINOWITZ, BOUDIN, STANDARD, KRINSKY & LIEBERMAN, P.C., New York, New York; *Attorneys for Philip R. Shawe.*

Frank E. Noyes, II, OFFIT KURMAN, P.A., Wilmington, Delaware; Adam K. Bult, BROWNSTEIN HYATT FARBER SCHRECK, LLP, Las Vegas, Nevada; *Attorneys for TransPerfect Global, Inc.*

Jennifer C. Voss, Cliff C. Gardner, and Elisa M.C. Klein, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Custodian Robert B. Pincus*.

**BOUCHARD, Chancellor**

Nine years ago, in shifting fees where a litigant had advanced frivolous arguments, then-Chancellor Strine remarked that "it is more time-consuming to clean up the pizza thrown at a wall than it is to throw it."[1] The "pizza principle" is on full display in this decision.

Before the court are petitions the Custodian of TransPerfect Global, Inc. filed for reimbursement of attorneys' fees and expenses he and his counsel incurred from May 2019 to December 2020. The amount is large—approximately $3.66 million. As detailed below, however, the vast majority of this amount was incurred because TransPerfect and its 99% owner, Philip R. Shawe, kept throwing pizzas at the wall. Among other things, they sued the Custodian in Nevada state court concerning two of his fee petitions in contempt of an exclusive jurisdiction provision in an order of this court; prematurely made not one, but five different attempts for appellate review of the contempt decision; objected in 192 pages of briefing and 108 pages of expert submissions to virtually every entry in the Custodian's billing records; and filed three non-meritorious motions attacking various aspects of the fee petitions.

In this unduly lengthy opinion—necessitated by having to clean up the "extra-large, deep-dish pie[s] with lots of toppings"[2] that TransPerfect and Shawe have

---

[1] *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 882 n.184 (Del. Ch. 2012).

[2] *Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 998 (Del. Ch. 2012).

1

thrown against the wall—the court grants the Custodian's fee petitions in the amount of $3,242,251, to be paid in the manner explained herein.

## I. BACKGROUND[3]

The factual and procedural background of these actions is discussed in detail in numerous opinions of this court and the Delaware Supreme Court.[4] This decision recites facts relevant to the fee petitions and related motions.

### A. Initial Appointment of the Custodian

Before these actions were filed, the shares of TransPerfect Global, Inc. ("TPG," "TransPerfect," or the "Company") were held by Elizabeth Elting (50%), Philip R. Shawe (49%), and his mother, Shirley Shawe (1%). This decision refers to TPG and Shawe together, at times, as "Respondents" or "Objectors."

On May 23, 2014, Elting filed the first of these actions seeking, among other things, the appointment of a custodian to sell the Company under 8 *Del. C.* § 226

---

[3] Civil Actions Nos. 9700-CB and 10449-CB have been litigated together since their inception but were not formally consolidated. Docket citations refer to C.A. No. 9700-CB.

[4] *See In re TransPerfect Glob., Inc.*, 2019 WL 5260362, at *1 (Del. Ch. Oct. 17, 2019), *appeal dismissed sub nom. TransPerfect Glob., Inc. v. Pincus*, 224 A.3d 203 (Del. 2019) (TABLE), and *cert. denied*, 2019 WL 6130807 (Del. Ch. Nov. 18, 2019); *In re TransPerfect Glob., Inc.*, 2018 WL 904160 (Del. Ch. Feb. 15, 2018), *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018) (TABLE); *In re TransPerfect Glob., Inc.*, 2017 WL 3499921 (Del. Ch. Aug. 4, 2017); *In re Shawe & Elting LLC*, 2016 WL 3951339 (Del. Ch. July 20, 2016), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 142 (Del. 2017); *In re TransPerfect Glob., Inc.*, 2016 WL 3477217 (Del. Ch. June 20, 2016, revised June 21, 2016); *Shawe v. Elting*, 2015 WL 5167835 (Del. Ch. Sept. 2, 2015); *In re Shawe & Elting LLC*, 2015 WL 4874733 (Del. Ch. Aug. 13, 2015), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

2

because of stockholder and board level deadlocks between its co-founders (Elting and Shawe) that threatened the Company with irreparable injury.[5] On March 9, 2015, a few days after the conclusion of a six-day merits trial and while the matter was under submission, the court entered an order (the "Initial Order") appointing Robert B. Pincus—then a corporate partner at Skadden, Arps, Slate, Meagher & Flom LLC ("Skadden")—as "custodian of TPG . . . for the purpose of serving as a mediator to assist Elting and Shawe in negotiating a resolution of their disputes."[6]

Paragraph 7 of that Initial Order provided that: (i) "[t]he Custodian shall be compensated at the usual hourly rate he charges as a partner of Skadden," (ii) "[t]he Custodian shall petition the Court on a monthly basis, or such other interval as the Court may direct, for approval of fees and expenses," and (iii) "[a]ny fees and expenses approved by the Court shall be paid promptly by TPG."[7]

## B.    The Post-Trial Opinion and August 2015 Order

On August 13, 2015, after the parties failed to resolve their disputes through mediation with the Custodian, the court issued a 104-page post-trial opinion and implementing order (the "August 2015 Order"). The August 2015 Order entered judgment in Elting's favor on her claims under Section 226[8] and appointed Pincus

---

[5] Verified Pet. of Dissolution and Appointment of a Custodian or Receiver at 1 (Dkt. 1).

[6] Dkt. 515 ¶ 1.

[7] *Id.* ¶ 7.

[8] Dkt. 607 ¶¶ 2, 4.

as the custodian of TPG (the "Custodian") (i) "to oversee a judicially ordered sale of the Company" and (ii) in the interim before a sale was consummated, "to serve as a third director with the authority to vote on any matters on which Shawe and Elting cannot agree and which rise to the level that [the Custodian] deems to be significant to managing the Company's business and affairs."[9]

The August 2015 Order required the Custodian to file a report with this court every thirty days concerning his progress.[10] Paragraph 9 of the August 2015 Order afforded the Custodian and Skadden judicial immunity, indemnification, and advancement rights:

> The Custodian and the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, its partners and employees (collectively, "Skadden") are entitled to judicial immunity and to be indemnified by TPG, in each case, to the fullest extent permitted by law. Without limiting the generality of the foregoing, fees and expenses incurred by the Custodian and Skadden in defending any civil, criminal, administrative or investigative claim, action, suit or proceeding reasonably related to the Custodian's responsibilities under this order shall be paid by TPG in advance of the final disposition of such claim, action, suit or proceeding within 15 days of a statement therefor.[11]

---

[9] *Shawe & Elting LLC*, 2015 WL 4874733, at *32.

[10] Dkt. 607 ¶ 8.

[11] *Id.* ¶ 9. In addition to obtaining these protections, the Company and Pincus entered into a Director Indemnification Agreement on August 19, 2015, which affords Pincus certain rights to indemnification and advancement but only in his capacity as a director of TPG. *See* Dkt. 1361 Ex. A. The Director Indemnification Agreement expressly provides that these rights "shall be in addition to, but not exclusive of, any other rights which Indemnitee may have at any time under applicable law, the Certificate of Incorporation or Bylaws, any other agreement, vote of members or directors . . . or otherwise." *Id.* § 14A. Pincus' rights under the Director Indemnification Agreement are not at issue in this opinion.

4

Paragraph 10 of the August 2015 Order parroted the Initial Order, in that it: (i) permitted the Custodian to charge "at the usual hourly rate he charges as a partner of Skadden," (ii) directed the Custodian to "petition the Court on a monthly basis . . . for approval of fees and expenses," and (iii) required that TPG pay "[a]ny fees and expenses approved by the Court."[12] Paragraph 11 of the August 2015 Order further provided that the Custodian "may retain counsel (including Skadden) or other advisors to assist him," that the fees of any such counsel or advisors "shall be calculated on the same hourly rates charged by such counsel or advisors to clients represented outside this matter," and that "[t]he reasonable fees and expenses of such counsel or advisors shall be paid promptly by TPG."[13]

## C. The Sale Order

On February 8, 2016, the Custodian submitted to the court a proposed plan of sale for the Company that recommended holding a "modified auction."[14] After briefing and a hearing to address Shawe and Ms. Shawe's objections,[15] the court issued a letter opinion accepting the Custodian's recommendation to pursue a sale

---

[12] Dkt. 607 ¶ 10.

[13] *Id.* ¶ 11.

[14] Dkt. 735.

[15] *See TransPerfect*, 2016 WL 3477217, at *2.

of the Company through a modified auction and asked the Custodian "to confer with counsel for the parties and to submit an implementing order."[16]

On July 18, 2016, the court entered an order for the Custodian to undertake a sale process (the "Sale Order").[17] Paragraph 14 of the Sale Order: (i) repeated the requirement in paragraph 10 of the August 2015 Order that the Custodian to petition the court on a monthly basis for approval of his fees and expenses, (ii) provided that the fees of any counsel or advisors hired by the Custodian must be paid by the Company, and (iii) added a new provision affording the Custodian the right to place some of the proceeds of a sale transaction into an escrow account to cover unpaid fees and expenses that may be due to the Custodian and/or his advisors:

> The Custodian shall be compensated at the usual hourly rate he charges as a partner of the Firm. The Custodian also shall be reimbursed for reasonable travel and other expenses incurred in the performance of his duties. The Custodian shall petition the Court on a monthly basis, or such other interval as the Court may direct, for approval of fees and expenses. Any fees and expenses approved by the Court shall be paid promptly by the Company. The fees of any counsel or advisors retained by the Custodian (i) shall be determined pursuant to the applicable agreement entered into pursuant to Paragraph 7 hereof or (ii) shall be calculated on the same hourly rates charged by such counsel or advisors to clients represented outside this matter. Such fees and expenses of such counsel or advisors shall be paid promptly by the Company upon approval of the Custodian. In the event any fees and expenses of the Custodian or any counsel or advisors retained by the Custodian or by the Company at the Custodian's direction remain unpaid at the closing of the Sale Transaction (or any claims for indemnification or

---

[16] *Id.* at *5.

[17] Dkt. 848.

advancement remain outstanding), the Custodian may provide for the proceeds of the sale to be paid into an escrow account and for the unpaid fees and expenses (and any claims for indemnification or advancement) to be deducted from the proceeds, and then for the proceeds to be distributed pro rata to the Company's stockholders.[18]

Although Shawe submitted revisions to virtually every other provision in the Sale Order, he did not propose any revisions to paragraph 14.[19]

The Sale Order also included judicial immunity, indemnification, and advancement provisions nearly identical to those provided in the August 2015 Order.[20] Paragraph 15 of the Sale Order further provided that "[a]ll actions, recommendations and decisions of the Custodian shall be presumed to have been made on an informed basis, in good faith, and in the honest belief that such actions, recommendations and decisions were in the best interests of the Company."[21]

### D. Shawe is Sanctioned by the Court

Shortly before the merits trial, Elting filed a motion for sanctions against Shawe alleging serious acts of misconduct,[22] which were the subject of a separate two-day evidentiary hearing in January 2016. On July 20, 2016, the court issued a memorandum opinion (the "Sanctions Opinion") in which it found "that Shawe

---

[18] *Id.* ¶ 14.

[19] *See* Dkt. 837 Ex. A ¶ 14.

[20] Dkt. 848 ¶ 16.

[21] *Id.* ¶ 15.

[22] Dkt. 480.

7

acted in bad faith and vexatiously during the course of the litigation in three respects," namely:

> (1) by intentionally seeking to destroy information on his laptop computer after the Court had entered an order requiring him to provide the laptop for forensic discovery; (2) by, at a minimum, recklessly failing to take reasonable measures to safeguard evidence on his phone, which he regularly used to exchange text messages with employees and which was another important source of discovery; and (3) by repeatedly lying under oath—in interrogatory responses, at deposition, at trial, and in a post-trial affidavit—to cover up aspects of his secret deletion of information from his laptop computer and extraction of information from the hard drive of Elting's computer.[23]

With respect to the third category, the court specifically found, among other things, that Shawe secretly accessed Elting's computer remotely "at least 44 times" and "gained access to approximately 19,000 of Elting's Gmails, including approximately 12,000 privileged communications with her counsel,"[24] and deleted approximately 19,000 files from his laptop the day before an image of it was to be taken pursuant to discovery orders of the court.[25]

As a sanction, Shawe was ordered to pay Elting approximately $7.1 million to reimburse a portion of her legal fees.[26] Indicative of the extraordinary contentiousness of the litigation, as of July 2016, Shawe and Elting together spent

---

[23] *Shawe & Elting LLC*, 2016 WL 3951339, at *1.

[24] *Id.* at *2.

[25] *Id.* at *5.

[26] Dkt. 885 ¶ 13.

approximately $27 million on the litigation over a 20-month period, with Shawe accounting for more than $13.8 million of that amount.[27]

**E.      The Shawes Sue Elting's Counsel, Financial Advisor, and Husband**

During the interim between the Custodian's proposal to conduct a modified auction in February 2016 and entry of the sale order in July 2016, Shawe and his mother launched a barrage of lawsuits against Elting's counsel, financial advisor, and husband.

On April 21, 2016, Shawe sued Ronald Greenberg and his law firm, Kramer Levin Naftalis & Frankel, LLP, Elting's lead counsel at the merits trial, in New York state court under New York Judiciary Law § 487, and sued Elting, Greenberg, and Kramer Levin for malicious prosecution.[28]

On May 6, 2016, Ms. Shawe sued Kidron Corporate Advisors LLC and Mark Segall, a co-owner and director of Kidron, in New York state court.[29]  Kramer Levin hired Kidron on Elting's behalf to serve as a financial advisor.[30]  Ms. Shawe alleged that Kidron and Segall "aided and abetted Elting's fiduciary duty breaches" and "aided Elting's supposed 'scheme' of manufacturing deadlock."[31]

---

[27] *TransPerfect*, 2018 WL 904160, at *21; Dkt. 885 at 3-4.

[28] *Shawe v. Elting*, 2017 WL 2882221, at *4 (N.Y. June 29, 2017).

[29] *Id.* at *7.

[30] *Shawe v. Elting LLC*, 2015 WL 4874733, at *12.

[31] *Shawe v. Elting*, 2017 WL 2882221, at *7.

9

On May 18, 2016, Ms. Shawe sued Cushman & Wakefield, Inc. and Michael Burlant, an executive director at Cushman and Elting's husband, in New York state court.[32] Ms. Shawe asserted four claims against Cushman and Burlant that "all relate to the allegation that Burlant, who was retained to help the Company find new office space in London, scuttled potential lease opportunities to aid Elting [in obtaining] leverage in her disputes with Shawe, thereby causing the Company to lease inferior office space, which supposedly impeded its work."[33]

On June 29, 2017, the Supreme Court of New York dismissed all three of these actions in a single opinion.[34] The New York court found that "[t]he three cases. . . represent some of Shawe's most recent collateral challenges to the loss he suffered in Delaware. They are replete with revisionist history that *borders on downright frivolity*. It is as if the Delaware proceedings, and its notable holdings, never occurred."[35] The court also observed that Shawe was engaged in forum shopping:

> These cases, clearly, are a forum shopping exercise based on Shawe's misguided hope that this court might either view his behavior more charitably than the Delaware courts or decide not to follow their rulings. As noted earlier and addressed further below, given Shawe's wealth, this court has serious concerns that litigation might prove perpetual

---

[32] *Id.*

[33] *Id.*

[34] *Id.* at *15.

[35] *Id.* at *1 (emphasis added).

10

absent a filing injunction, as the $7 million sanction imposed by the Chancellor does not appear to have had much of a deterrent effect.[36]

The court concluded that, "*given the borderline frivolity of these lawsuits*, Philip and Shirley Shawe are cautioned that the maintenance of future suits in this court that are barred by the outcome of the Delaware action may result in sanctions and a filing injunction."[37]

## F. A TPG Employee Sues the Custodian and the Chancellor

On July 26, 2016, eight days after the court entered the Sale Order, Timothy Holland, a TransPerfect employee, filed an action in the United States District Court for the Southern District of New York against the Custodian and this judicial officer, asserting that the Sale Order chilled his First and Fourth Amendment rights.[38] On September 19, 2017, the district court dismissed the action under the *Younger* abstention doctrine.[39] Holland filed a notice of appeal on October 19, 2017, which was withdrawn on May 11, 2018, after the sale transaction closed.

---

[36] *Id.* at *12.

[37] *Id.* at *14 (emphasis added).

[38] *Holland v. Bouchard*, 2017 WL 4180019, at *2 (S.D.N.Y. Sept. 19, 2017).

[39] *Id.* at *1.

At the time, Holland worked exclusively with Shawe at TransPerfect.[40] Holland also is the incorporator of "Citizens for a Pro-Business Delaware Inc.,"[41] an organization that has run ads criticizing the expenses that were incurred as a result of the sale process, including fees paid to Skadden.[42] In a letter to the court on April 10, 2020, counsel for Shawe asserted that the "accusation that there is some connection between Shawe and employees of TPG" and Citizens for a Pro-Business Delaware is "false."[43] Yet, in an interview on April 2, 2020, Chris Coffey, the "Campaign Manager" for the Citizens group, stated that Citizens for a Pro-Business Delaware "was formed by the employees" of TPG and that "the head of the group is the number 2 or 3 person at the company."[44]

### G.    Affirmance of the Court of Chancery's Decisions

On February 13, 2017, the Delaware Supreme Court affirmed the August 2015 post-trial opinion, the August 2015 Order and the Sale Order.[45] In its opinion, the

---

[40] Appellee's Answering Br. at 43, *Shawe v. Elting*, No. 423, 2016 (Del. Nov. 3, 2016), Dkt. 38.

[41] B3572-B3579 to the App. in Support of Appellee's Answering Br. at App. B3579, *Shawe v. Elting*, No. 423, 2016 (Del. Nov. 3, 2016), Dkt. 39.

[42] *See* Golden Aff. Exs. C-E (Dkt. 1219).

[43] Dkt. 1487.

[44] Dkt. 1488 at 2 n.2 (linking to Radio Interview on WXDE with Chris Coffey on April 2, 2020). As noted below, in at least one instance, the Citizens group issued a press release describing a motion TPG and Shawe filed with the court *before* the motion actually had been filed.

[45] *Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

12

high court summarized numerous factual findings of this court, noting "that Shawe bullied Elting and those aligned with her, expressing his desire to 'create constant pain' for Elting until she agreed with Shawe's plans," and that "Shawe's conduct was reprehensible."[46]

Also on February 13, 2017, the Delaware Supreme Court affirmed the Sanctions Opinion and its implementing order.[47] The high court concluded that "[t]he Court of Chancery did not abuse its discretion by sanctioning Shawe based on a *clear record of egregious misconduct and repeated falsehoods* during the litigation."[48]

## H. The Section 211 and 220 Actions

On April 20, 2017, Ms. Shawe filed an action in this court asserting a single claim under 8 *Del. C.* § 211(c) to compel TPG to hold an annual meeting of its stockholders.[49] Ms. Shawe intended to use the Section 211 action not to schedule a straightforward annual meeting, but to implement a highly conditional proposal she had made to break the deadlocks between Elting and her son by granting a limited

---

[46] *Id.* at 157, 167 n.55.

[47] *Shawe v. Elting*, 157 A.3d 142 (Del. 2017).

[48] *Id.* at 152 (emphasis added).

[49] *TransPerfect*, 2017 WL 3499921, at *2.

proxy to Elting. But the conditions in the proposal were completely unacceptable to Elting, making it a non-starter.[50]

On August 4, 2017, in denying Ms. Shawe's motion for expedition, the court reasoned as follows:

> In view of the specific and unique circumstances of this case, where the sale process that was set in motion *almost two years ago* is expected to conclude in the near future, it is my opinion that TPG should not be required to respond to the Section 211 Action at this stage. Ms. Shawe explicitly states that she "has not commenced [the Section 211] proceeding merely to enforce a technical corporate statutory right. Rather, . . . Ms. Shawe intends to end the division of the stockholders that led to the 2014 Stipulation." But Ms. Shawe also has steadfastly insisted on conditioning her grant of a proxy to Elting on conditions that Elting already has rejected. Thus, even if a stockholder meeting were ordered, no proxy would be granted, no deadlock would be broken, and no director would be elected. It would be a futile exercise.[51]

Three days later, on August 7, Ms. Shawe requested certain "itemized billing records" from the Custodian.[52] On September 12, 2017, Ms. Shawe converted her

---

[50] The conditions of Ms. Shawe's proposal included the (i) "adoption of an amendment to TPG's bylaws restructuring the Board to consist of five directors serving staggered terms, and authorizing a majority of the members of the Board to fill any vacancies that may exist from time to time;" (ii) "adoption of certain guidelines for significant corporate governance issues, including that any sitting director up for re-election at the next annual meeting must submit a contingent resignation that becomes effective only if the director fails to receive a sufficient number of votes for re-election and the Board accepts the resignation;" (iii) "issuance of the remaining authorized shares of the Company to each of the current stockholders on a pro rata basis according to their current ownership interests;" and (iv) "provision of a proxy allowing Elting to vote Ms. Shawe's shares solely for the election of any directors of TPG at the next five annual meetings of the stockholders." *Id.*

[51] *Id.* at *5 (alterations in original) (internal citations omitted).

[52] Dkt. 1539 Ex. D at 3.

14

information request into a formal demand under 8 *Del. C.* § 220 to inspect books and records of the Company in order to "evaluate the propriety of the amounts included in recent invoices from the Custodian and his advisors to be paid by the Company, pursuant to" the Sale Order.[53]  On October 1, 2017, Ms. Shawe sued the Company to enforce her inspection demand.[54]  The Custodian expressed concern that Ms. Shawe was seeking this information "as a potential new avenue to try to undermine the sales process."[55]  The Section 220 action did not progress beyond the pleadings and was dismissed in connection with the closing of the sale transaction.

## I.    Shawe Sues the Custodian Twice in Federal Court

On March 15, 2017, Shawe and Ms. Shawe sued the Custodian and the Delaware Secretary of State in the United States District Court for the District of Delaware, raising constitutional claims that were never raised at the merits trial and deemed waived by the Delaware Supreme Court.[56]  On September 26, 2017, the

---

[53] *Shawe v. TransPerfect Glob., Inc.,* C.A. No. 2017-0697-AGB, Dkt. 1 Ex. 9 at 1.

[54] *Shawe v. TransPerfect Glob., Inc.,* C.A. No. 2017-0697-AGB, Dkt. 1.

[55] Dkt. 1539 Ex. E at 2.

[56] *Shawe v. Pincus*, 265 F. Supp. 3d 480, 484 (D. Del. 2017) ("Ms. Shawe's constitutional arguments were deemed waived [by the Delaware Supreme Court] for failure to raise them first in the Chancery Court."); *see also Shawe*, 157 A.3d at 168-69 (holding that Ms. Shawe's constitutional arguments, which she "admits that she did not properly present this issue before the Court of Chancery," were "waived for failure to raise them first in the Court of Chancery").

15

court district court dismissed the Shawes' constitutional claims, concluding they were barred under the *Rooker-Feldman* doctrine.[57]

Undeterred, the Shawes appealed the district court's dismissal in the United States Court of Appeals for the Third Circuit and sought expedition of that appeal, which was denied.[58] The Shawes also filed a motion in the district court to stay the sale process, which was denied on October 27, 2017.[59]

On September 1, 2017, Shawe again sued the Custodian, this time in the United States District Court for the Southern District of New York. The complaint in that action again asserted constitutional claims.[60] This action was voluntarily dismissed on May 8, 2018 in connection with the closing of the sale transaction.[61]

## J.    Shawe is Sanctioned Again

On September 24, 2017, Shawe sued Potter Anderson & Corroon, LLP and Kevin R. Shannon, a Potter Anderson partner, in the United States District Court for

---

[57] *Shawe*, 265 F. Supp. 3d at 483.

[58] *See* Order Denying Appellants' Motion to Expedite Case, *Shawe v. Pincus*, 17-3185 (3d Cir. Nov. 6, 2017).

[59] *Shawe v. Pincus*, 2017 WL 4856863, at *1 (D. Del. Oct. 27, 2017).

[60] *See* Complaint for Violation of Civil Rights and Supremacy Clause, *Shawe v. Pincus*, 17-cv-06673-WHP (S.D.N.Y. Sept. 1, 2017), Dkt. 1.

[61] Notice of Voluntary Dismissal Pursuant to F.R.C.P. 41(a)(1)(A)(i), *Shawe v. Pincus*, 17-cv-06673-WHP (S.D.N.Y. May 9, 2018), Dkt. 53.

the District of Delaware.[62]  Potter Anderson has served as Elting's Delaware counsel from the inception of these actions.  Shawe alleged that Potter Anderson and Shannon committed a "'prima facie tort' for 'maliciously and intentionally' misrepresenting certain fees incurred in the Court of Chancery during the computation of the order of sanctions."[63]  As the district court explained, "[t]he entirety of the allegations against Potter and Shannon concern their submission of fee estimates for the order of sanctions in the Delaware Court of Chancery."[64]

On November 7, 2017, Potter Anderson and Shannon moved for sanctions against Shawe and his Delaware attorney, Christopher M. Coggins of Coggins Law, LLC.[65]  On December 8, 2017, the district court granted this motion for sanctions and dismissed the action with prejudice.  In doing so, the court explained: "The Delaware Court of Chancery twice considered and twice rejected the very same allegations Shawe includes in his complaint in the instant action. . . .  Shawe's purpose in presenting the Court with the complaint and the amended complaint was

---

[62] *Shawe v. Potter Anderson & Corroon LLP*, 2017 WL 6397342, at *2 (D. Del. Dec. 8, 2017).

[63] *Id.*

[64] *Id.*

[65] *Id.* at *1, *3.

17

to harass the Defendants and to abuse the court system, in violation of Rule 11(b)(1)."[66]

As a sanction, the district court ordered Shawe "to pay 50% of the Defendants' attorneys' fees and expenses incurred in connection with the defense of this civil action for his violation of Rule 11(b)(1)," with his attorney, Coggins, responsible for the other 50%.[67] The court declined to impose a filing injunction on Shawe, but expressly referenced the June 29, 2017 opinion of the Supreme Court of New York and advised "that any future court plagued by subsequent frivolous lawsuits brought by Shawe to collaterally attack the Delaware rulings should very seriously consider imposing an injunction to put a final end to this behavior."[68]

## K.    The Final Order

After the Supreme Court affirmed the Sale Order, the Custodian oversaw a sale process involving multiple rounds of bidding that resulted in execution of a securities purchase agreement on November 19, 2017 (the "Sale Agreement").[69] Under the Sale Agreement, Shawe acquired Elting's 50% of the Company for $385 million, subject to certain adjustments.[70] The transaction closed on May 7, 2018.

---

[66] *Id.* at *3-4.

[67] *Id.* at *5.

[68] *Id.*

[69] Dkt. 1185 Ann. C.

[70] *See id.* § 1.1.

The Sale Agreement set aside $5 million from the purchase price—half funded by Shawe and half funded by Elting—"as a non-exclusive source of funds for securing," among other things, "amounts payable to the Custodian or his advisors, including, without limitation, investment banking, legal and accounting fees and expenses for services performed prior to or after the Closing."[71]  The $5 million was placed into an "Escrow Account" (the "Escrow").[72]

Section 7.5(a) of the Sale Agreement requires Shawe to, among other things, "take all necessary actions to cause the Company and the Company Subsidiaries to continue to indemnify and hold harmless, to the fullest extent permitted by applicable Law, the Custodian and each of the Company's and the Company Subsidiaries' present and former directors."[73]  Section 12.18 of Sale Agreement provides that "the duties and responsibilities of all parties subject to the Sale Order and all other orders of the Court in Civil Action Nos. 9700-CB and 10449-CB shall remain in full force and effect in accordance with their terms."[74]

On February 15, 2018, over objections from Elting, the court accepted the Custodian's recommendation to approve the transaction embodied in the Sale

---

[71] *Id.* § 2.2.

[72] *See id.* §§ 1.1, 2.4.

[73] *Id.* § 7.5(a).

[74] *Id.* § 12.18.

Agreement[75] and entered an order approving the Sale Agreement (the "Final Order").[76] Similar to the Sale Agreement, the Final Order keeps in place all prior orders entered in these actions:

> The rights and authority granted to the Custodian and the duties and responsibilities of all parties to the Actions under the Sale Order and all other orders of the Court in Civil Action Nos. 9700-CB and 10449-CB shall remain in full force and effect in accordance with their terms until otherwise modified or discharged by the Court.[77]

The Final Order also provides that the court has exclusive jurisdiction over the parties to the actions "for all matters relating to the Actions":

> Without impacting the finality of this Order and judgment, the Court retains continuing and exclusive jurisdiction over the parties to the Actions for all matters relating to the Actions, including the administration, interpretation, effectuation or enforcement of the Sale Agreement and the Related Agreements, and all orders of the Court in Civil Action Nos. 9700-CB and 10449-CB, and further retains and reserves continuing jurisdiction to consider any applications that the Custodian may make for the Court's assistance in addressing any problems encountered by the Custodian in performing his duties under any order of the Court.[78]

Finally, similar to the August 2015 Order and the Sale Order, the Final Order includes a provision providing the Custodian and Skadden with judicial immunity as well as indemnification and advancement rights:

---

[75] *See TransPerfect*, 2018 WL 904160, at *27.

[76] Dkt. 1243.

[77] *Id.* ¶ 8.

[78] *Id.* ¶ 10.

Without limitation, the Custodian and Skadden, Arps, Slate, Meagher & Flom LLP (and its partners and employees) are entitled to judicial immunity and to be indemnified by the Company (or its successor in interest), in each case, to the fullest extent permitted by Law. Without limiting the generality of the foregoing and notwithstanding anything that could be construed to the contrary in this Order or the Sale Agreement, fees and expenses incurred by the Custodian or Skadden, Arps, Slate, Meagher & Flom LLP (and its partners and employees) in defending or prosecuting any civil, criminal, administrative or investigative claim, action, suit or proceeding reasonably related to the Custodian's responsibilities under the Sale Order or this Order, shall be paid by the Company (or its successor in interest) in advance of the final disposition of such claim, action, suit or proceeding, within 15 days of receipt of a statement thereof.[79]

On May 3, 2018, the Delaware Supreme Court affirmed the Final Order.[80] In his brief to the Supreme Court supporting the Final Order, Shawe praised the Custodian and Skadden, noting that Skadden and the Custodian's other advisors were "experts . . . whose qualifications are unchallenged."[81] Shawe also highlighted that the record "overwhelmingly demonstrated that" the Custodian "had no conflict of interest"[82] and that he "fulfilled [his] dual mandate"[83] "to sell the Company with

---

[79] *Id.* ¶ 7.

[80] *Elting v. Shawe*, 185 A.3d 694 (Del. 2018) (TABLE).

[81] *See* Answering Br. of Resp't-Below Appellee Philip R. Shawe at 13, *Elting v. Shawe*, No. 90, 2018 (Del. Apr. 5, 2018), Dkt. 18.

[82] *Id.* at 26.

[83] *Id.* at 46.

a view toward maintaining the business as a going concern and maximizing value for the stockholders."[84]

### L. Fee Petitions from May 2018 to April 2019

On May 10, 2018, the Custodian filed his monthly report in which he informed the court that he had resigned as a director of the Company but would continue to serve as Custodian for other purposes, with the expectation of filing a proposed order of discharge at a later date.[85] In the same letter, the Custodian petitioned the court under compensation provisions in paragraphs 10 and 11 of the August 2015 Order to approve the fees and expenses he and his advisors had incurred and to require that they be paid by the Company.[86] The Custodian also advised the court of his intention to petition the court in the future for payment of his fees and expenses from the Escrow.[87]

From June 2018 to April 2019, the Custodian's petitions for approval of fees and expenses explained that they would be paid from the Escrow.[88] In his January 2019 report, the Custodian informed the court and the parties that he had fully retired

---

[84] *Id.* at 7 (quoting *Shawe & Elting LLC*, 2015 WL 4874733, at *32).

[85] Dkt. 1261 at 2.

[86] *Id.* at 3.

[87] *Id.* at 3-4.

[88] *See* Dkts. 1267, 1269, 1271, 1273, 1275, 1277, 1279, 1281 Ex. 1, 1292 Ex. 1, 1303 Ex. 1, 1311 Ex. 1.

from Skadden as of December 31, 2018, and that future services he would be providing as Custodian would be charged at a reduced hourly rate of $950 per hour.[89]

## M.   The Cypress and H.I.G. Litigations

On August 16, 2018, Cypress Partners LLC filed a lawsuit against Shawe in the Supreme Court of the State of New York (the "Cypress Action").[90]  According to the four-count complaint, Cypress provided Shawe with advisory services in connection with the sale of TransPerfect, but Shawe refused to pay the balance of a negotiated fee in the amount of $800,000 or to participate in arbitration, as required by an engagement letter.[91]

On May 22, 2019, the Custodian received a "Subpoena to Appear at a Deposition and to Produce Documentary Evidence" from Cypress.[92]   The Custodian's deposition was scheduled for June 5, 2019.[93]  The subpoena sought, among other documents, "[a]ll documents and communications from July 1, 2016 through June 30, 2018 relating to," among other things, Shawe, Cypress, and "the Modified Auction, Sale Order, Shawe's purchase of Elting's interest in TPG, and

---

[89] Dkt. 1281 Ex. 1 at 3.

[90] *See* Dkt. 1315 Ex. 1 Attach. A at 1.

[91] *Id.* ¶¶ 3-9, 24-53.

[92] Dkt. 1441 Ex. 13.

[93] *Id.*

Sale Agreement."[94] Two of the Custodian's advisors in the sale process—Credit Suisse Securities (USA) LLC and Alvarez & Marsal—also received subpoenas from Shawe and Cypress.[95] Skadden and Cypress's counsel eventually reached a resolution that Cypress would not enforce the subpoena against the Custodian.[96]

On April 11, 2019, TPG filed a lawsuit against Lionbridge Technologies, Inc. and H.I.G. Middle Market LLC, which held a majority interest in Lionbridge, in the United States District Court for the Southern District of New York (the "H.I.G. Action").[97] H.I.G. was one of the three final bidders for the Company during the sale process.[98] In the H.I.G. Action, TPG is seeking "in excess of $300,000,000" in damages from H.I.G. and Lionbridge for allegedly misusing the Company's trade secrets or confidential information that H.I.G. acquired during the sale process to compete unfairly with the Company.[99] The Custodian is listed as a "Relevant Non-Part[y]" in the H.I.G. Action.[100]

On April 25, the Custodian and Skadden each received a litigation hold notice from TPG's counsel in the H.I.G. Action, requiring that they preserve certain

---

[94] *See id.* ¶¶ 1-3.

[95] *See* Dkt. 1441 Ex. 14.

[96] *See* Dkt. 1441 Ex. 15.

[97] *See* Dkt. 1315 Ex. 1 Attach. B.

[98] *TransPerfect*, 2018 WL 904160, at *11-12.

[99] Dkt. 1315 Ex. 1 Attach. B at 1 (¶ 1), 43 (¶ h).

[100] *Id.* ¶ 16.

categories of documents, including "[a]ny and all records relating to the forced sale of TPG through an auction contest in the Delaware Court of Chancery."[101]

On June 15, 2020, TPG served subpoenas on the Custodian and Skadden in the H.I.G. Action, seeking production of over 50 different categories of documents.[102] TPG also sent subpoenas to several of the Custodian's advisors around this time, seeking similar information.[103]

### N. The May 2019 Report

On May 8, 2019, in his monthly report, the Custodian informed the court about the filing of the Cypress and H.I.G. Actions, described the nature of the allegations, and apprised the court that given the nature of the actions, he intended in the future to seek payment for expenses incurred in connection with these actions under the court's orders instead of using the Escrow for that purpose:

> Given the general circumstances, as well as the nature of the [H.I.G. Action] and the Cypress Complaint, and the scope of the Litigation Hold Notices relating to the [H.I.G. Action], I anticipate expenses to be higher in future months than in recent months, and, in future applications, I intend to seek prompt payment, per Court order, directly from TransPerfect Global, Inc. for these expenses, while reserving all rights vis-a-vis the Escrow Fund, which is a "non-exclusive source of funds" to pay my fees and expenses and the fees and expenses of my agents and representatives post-Closing (funded 50/50 by Mr. Shawe and Ms. Elting).[104]

---

[101] Dkt. 1315 Ex. 1 Attach. E at 1.

[102] *See* Dkt. 1576 Exs. 2-3.

[103] *See* Dkt. 1576 Exs. 6, 8.

[104] Dkt. 1315 Ex. 1 at 10-11.

The report cited three provisions from prior court orders as support for seeking payment from the Company for time and expenses incurred in connection with the Cypress and H.I.G Actions: the indemnification provisions in paragraph 7 of the Final Order and paragraph 16 of the Sale Order, and the compensation provision in paragraph 14 of the Sale Order.[105]

The May 2019 report sought approval to pay from the Escrow $60,104.70 in unbilled fees and expenses, which included $25,784.70 of Skadden's fees and expenses and $30,900 of Ernst & Young LLP's fees and expenses "related to their work on pre-Closing tax periods."[106] On May 17, 2019, the court entered an order approving this request.[107]

## O. The June and July 2019 Fee Petitions

On June 17, 2019, the Custodian filed his monthly report and sought court approval concerning $58,767.71 in fees and expenses he had incurred that primarily related to the Cypress and H.I.G. Actions.[108] Referencing the explanation provided in his May 8, 2019 report, the Custodian requested that these expenses be paid

---

[105] *Id.* at 10 n.7.

[106] *Id.* at 11-12.

[107] Dkt. 1318.

[108] Dkt. 1324 Ex. 1 at 2.

directly by the Company rather than from the Escrow.[109] On June 28, 2019, the court entered an order approving this request.[110]

On July 10, 2019, the Custodian filed his monthly report and sought court approval concerning $90,089.14 in fees and expenses, "of which $83,653 was incurred by Ernst & Young LLP in connection with its preparation of certain preclosing tax information."[111] Referencing the positions taken in his May and June reports, the Custodian requested that the amounts billed by Ernst & Young be paid from the Escrow and that the balance of $6,436.14 be paid directly by TPG.[112] On July 17, 2019, the court entered an order approving this request.[113] The June and July 2019 Orders are referred to together as the "Fee Orders."

**P.      TPG Demands Documents from the Custodian's Advisors**

On August 2, 2019, Adam Mimeles, TPG's General Counsel, sent a letter to Alvarez & Marsal "request[ing] all electronic and hard copies of all files, documents, correspondence, communications (electronic or otherwise) notes, etc. in connection with work done, and advice provided, by Alvarez & Marsal on behalf of its client,

---

[109] *Id.*

[110] Dkt. 1327.

[111] Dkt. 1329 Ex. 1 at 2.

[112] *Id.*

[113] Dkt. 1331.

27

TransPerfect Global, Inc. and its subsidiaries."[114]  In the performance of his duties, the Custodian retained Alvarez and Marsal as an advisor to provide "financial and operational services to the Company."[115]  No subpoena was included with the letter to Alvarez & Marsal, and no explanation was provided as to why TPG believed it was entitled to this information.[116]

Credit Suisse, which the Custodian had retained "as his exclusive financial advisor for undertaking the sale process,"[117] received a similar letter from Mimeles on behalf of TPG, again with no subpoena or explanation.[118]  Credit Suisse and Alvarez & Marsal referred the demands to the Custodian and Skadden.[119]

### Q.  The Filing of the Nevada Action and Finding of Contempt

On August 13, 2019, TransPerfect sued the Custodian in Nevada state court, asserting claims for breach of fiduciary duty and declaratory relief (the "Nevada Action").[120]  The Nevada Action sought damages against Pincus concerning the

---

[114] Dkt. 1441 Ex. 19.

[115] *TransPerfect*, 2018 WL 904160, at *3.

[116] *See* Dkt. 1441 Ex. 19.

[117] *TransPerfect*, 2018 WL 904160, at *7.

[118] *See* Dkt. 1441 Ex. 20.

[119] *See* Dkt. 1441 Exs. 19-20.

[120] In August 2018, the Company reincorporated in Nevada.  Dkt. 1376 Ex. 1, ¶ 2.

$65,203.85 that the Company was ordered to pay him under the Fee Orders.[121]  It also sought a declaration that the Company had no duty to indemnify the Custodian for this amount.[122]

On August 26, 2019, the Custodian filed a motion for civil contempt and sanctions against TPG and Shawe in these actions.[123]  In his motion, the Custodian asserted that TPG and Shawe were in contempt of this court's orders by (i) filing the Nevada Action, in violation of paragraph 10 of the Final Order and (ii) failing to pay the $65,203.85 that the Company was ordered to pay the custodian under the Fee Orders.[124]

On October 17, 2019, for the reasons explained in a memorandum opinion, the court granted the Custodian's motion for civil contempt and sanctions against TPG and Shawe with respect to the Final Order, but reserved judgment with respect to the Fee Orders.[125]  Specifically, the court found that the Custodian established by

---

[121] *Id.* ¶¶ 46-50. The $65,203.85 amount is the sum of the amounts the Company was ordered to pay in the June 2019 order ($58,767.71) and July 2019 order ($6,436.14) for fees and expenses the Custodian incurred relating to the Cypress and Lionbridge actions.

[122] *Id.* ¶¶ 51-54.

[123] Dkt. 1337.

[124] *See id.* ¶¶ 64-69.

[125] *TransPerfect*, 2019 WL 5260362, at *1.

29

clear and convincing evidence that Shawe and TransPerfect violated the exclusive jurisdiction provision in paragraph 10 of the Final Order in a meaningful way:[126]

> [T]he filing of the Nevada action violated paragraph 10 of the Final Order by depriving the court of exclusive jurisdiction over the Respondents (as parties to these actions) for "matters relating to the Actions." The nature of the violation is evident in at least two ways.
>
> First, the Nevada action specifically puts at issue—and thus deprives this court of exclusive jurisdiction over parties to these actions with respect to—the *interpretation* of the indemnification provisions in the [August] 2015 Order, the Sale Order, the Final Order, and the Sale Agreement. This is because, in order to grant the declaratory relief sought in the Nevada action, the Nevada court would need to construe the indemnification provisions in three of this court's orders and in the Sale Agreement to determine whether the Custodian is entitled to be indemnified for work he has performed with respect to the Cypress and Lionbridge actions.
>
> Indeed, if the Nevada action proceeds beyond the pleadings stage, the interpretation of other provisions of this court's orders inevitably would be placed at issue in that action as well. In its May 2019 report, when explaining his intention to charge his time for the Cypress and Lionbridge actions to the Company rather than obtaining payment from the Custodian Escrow Account, the Custodian specifically relied on, among other provisions, the compensation provision in paragraph 14 of the Sale Order. Thus, if the Nevada action continues beyond the pleadings stage, the Nevada court would need to construe Section 14 of the Sale Order—and the companion compensation provision in paragraph 10 of the [August] 2015 Order— to determine if the Custodian is entitled to be compensated for work he performed in connection with the Cypress and Lionbridge actions.
>
> Second, the Nevada action specifically puts at issue—and thus deprives this court of exclusive jurisdiction over parties to these actions with respect to—*enforcement* of the Fee Orders. This is because, in

---

[126] *Id.* at *10.

order to award the damages and/or declaratory relief sought in the Nevada complaint, the Nevada court would have to consider the legal effect of the Fee Orders, which require that $65,203.85 be paid to the Custodian for work he performed concerning the Cypress and Lionbridge actions.[127]

In its implementing order entered on October 17, 2019 (the "First Order"), the court enjoined TPG, Shawe and their agents "from prosecuting or taking any other action in" the Nevada Action, except to seek dismissal of that action.[128] The court also ordered that, if the Nevada Action was not dismissed by October 21, 2019, "Respondents shall pay a civil fine in the amount of $30,000 per day . . . beginning on . . . October 22, 2019, and continuing until such date as the Nevada action has been dismissed."[129] Finally, as documented in paragraph 4 of the First Order, the court ordered as a sanction that TPG and Shawe "shall pay all fees and expenses, including reasonable attorneys' fees, incurred by the Custodian and his counsel in (i) connection with the Nevada action and (ii) prosecution of the motion for civil contempt and sanctions in this court."[130]

On October 21, 2019, TPG dismissed the Nevada Action, thereby avoiding the per diem sanction.[131]

---

[127] *Id.* (internal footnotes omitted).

[128] Dkt. 1379 ¶ 2.

[129] *Id.* ¶ 3.

[130] *Id.* ¶ 4.

[131] *See* Dkt. 1395 ¶ 3.

31

**R.       The Denial of the Contempt Motion as to the Fee Orders**

On October 21, 2019, in a transcript ruling, the court denied the Custodian's motion for civil contempt and sanctions with respect to the Fee Orders.[132]  Although the court found that TPG violated the two Fee Orders by failing to pay the amounts due thereunder,[133] the court declined to find contempt of the Fee Orders as a discretionary matter because of "some practical concerns . . . at this stage of the case about the fee petition process, particularly with respect to the lack of precision concerning the deadlines for filing objections and making payments."[134]  Based on this ruling, the court explained that it would need to modify paragraph 4 of the First Order to make clear that the sanction to pay the Custodian's fees and expenses for contempt of court would not apply to the violation of the Fee Orders:

> Today's ruling does have one collateral effect with respect to the order
> I entered on October 17.  Specifically, I will modify paragraph 4(ii) of
> that order to require respondents to pay the fees and expenses incurred
> by the custodian's counsel only with respect to prosecution of the
> motion for civil contempt insofar as those fees and expenses concern
> the final order.  Thus paragraph 4(ii) will not award fees and expenses
> incurred with respect to the prosecution of the contempt motion insofar
> as the fee orders are concerned.[135]

---

[132] *See* Hr'g Tr. at 4-5 (Oct. 21, 2019) (Dkt. 1408).

[133] *Id.* at 6 ("[I]t is not disputed -- nor could it be -- that TransPerfect is bound by those orders as a party to these actions and that it has not paid $65,203.85 of the fees and expenses that the Court approved for payment and ordered the company to pay promptly.").  The court also rejected Respondents' defenses for lack of notice and the failure to serve the fee petitions through issuance of a summons.  *Id.* at 6-8.

[134] *Id.* at 8-9.

[135] *Id.* at 14.

The court also explained that it would include a fee-shifting provision in the implementing order if either side "acted in bad faith in the fee petition process" and that it would "implement changes to the fee petition process."[136]

On November 1, 2019, the court entered an order to implement its October 21 ruling (the "Second Order").[137] In accordance with the court's comments, quoted above, the Second Order modified the provision in the First Order requiring Respondents to pay, *as a sanction*, the Custodian's fees and expenses for prosecuting the contempt motion to limit the sanction to the prosecution of the Final Order:

> Paragraph 4 of the First Order is hereby modified to incorporate the text underlined below:

> Respondents shall pay all fees and expenses, including reasonable attorneys' fees, incurred by the Custodian and his counsel in (i) connection with the Nevada action and (ii) prosecution of the motion for civil contempt and sanctions in this court, insofar as such prosecution concerns TPG's and Shawe's contempt of the Final Order.[138]

This provision is referred to hereafter as the "Contempt Fee Award."

---

[136] *Id.* at 9, 10. Based on the implementation of these changes to the fee petition process, the court deemed moot an October 1, 2019 letter request from Respondents (Dkt. 1364) for certain billing information concerning the Custodian's September 25, 2019 fee petition and subsequent fee petitions. *Id.* at 14-15.

[137] Dkt. 1399.

[138] *Id.* ¶ 7.

Paragraph 3(e) of the Second Order contains the reciprocal fee-shifting provision for bad faith conduct the court discussed at the October 21 hearing, and made clear that the addition of this provision would not alter any of the Custodian's pre-existing rights to recover fees and expenses:

> To the extent that any party is found to have acted in bad faith regarding the fee petition and objection process set forth in Paragraph 3(c) herein, the Court may order that such party pay fees and expenses incurred by the other party or parties in connection with the objection process at issue. For the avoidance of doubt, any such order shall be in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement. Nothing in this Paragraph shall be construed to allow the Custodian a double recovery of fees and expenses, unless the Court otherwise orders. [139]

Paragraph 3 of the Second Order also established new procedures for the Custodian's submission of fee petitions. Specifically, paragraph 3(a) of the Second Order requires that the Custodian attach an "invoice, billing record or other document" to the fee petition containing certain specified information:

> (a)    As an exhibit to any fee petition submitted to the Court by the Custodian, the Custodian shall attach an invoice, billing record or other document (a "Confidential Record") providing the following information as to work for which payment is sought: (i) a description of such work; (ii) the date(s) on which such work was performed; (iii) the role (*e.g.*, partner, associate, paralegal, etc.) of each person performing such work; (iv) the billing rate of each person performing such work; (v) the number of hours billed for such work; and, to the extent that payment in respect of expenses is sought, (vi) the date on which such expenses were incurred; (vii) the nature and amount of such

---

[139] *Id.* ¶ 3(e).

expenses; and (viii) if expenses are to be paid to persons or entities other than the Custodian or Skadden, (a) the party to whom such expenses were (or are to be) paid; and (b) the invoice supplied to the Custodian in support of such expenses. The Custodian may redact from such Confidential Records: (i) the names of all persons performing work for which payment is sought; *provided*, *however*, that any redacted names of persons performing work for which payment is sought (other than the Custodian) shall be replaced with distinct and definite designations such as "Timekeeper A," "Timekeeper B" or similar, and any such designations shall remain constant throughout all Confidential Records for any person so designated and no distinct designation shall ever be used for more than one person; and (ii) information that the Custodian deems in good faith to be privileged or of a sensitive nature, including, but not limited to, the names of any individuals referenced in billing details.[140]

Also on November 1, 2019, the Court issued the Records Confidentiality Order.[141] The Records Confidentiality Order limited access to the billing records the Custodian would be required to submit in future fee petitions to specified persons,[142] conditioned access for certain person on the execution of an undertaking to comply with the order,[143] and limited the use for which the billing records could be used.[144]

---

[140] *Id.* ¶ 3(a).

[141] Dkt. 1400.

[142] *Id.* ¶ 2 (limiting access to billing records to "(i) the Court; (ii) the Custodian, his counsel and his advisors; (iii) counsel of record representing TransPerfect Global, Inc. . . . or Philip R. Shawe . . . in the above-referenced actions; (iv) the General Counsel of TPG; and (v) the Chief Executive Officer of TPG").

[143] *Id.* ¶ 5.

[144] *Id.* ¶ 3 (allowing billing records only to be used "for purposes of (i) any fee petition filed with the Court by the Custodian, or (ii) any objection, opposition or reply submission filed with the Court pursuant to Paragraph 3(c) of the Second Order").

At least thirteen representatives of Respondents signed undertakings and obtained access to information governed by the Second Records Confidentiality Order.[145]

## S.  TPG and Shawe Seek Appellate Review

In response to the court's ruling on the Custodian's motion for contempt, TPG and Shawe made a flurry of filings to appeal the court's rulings even though the court had not yet determined the amount of the Contempt Fee Award, which would require further submissions:

- On October 19, 2019, TPG filed a notice of appeal to the Delaware Supreme Court from the court's October 17, 2019 memorandum opinion and the First Order.[146]

- On October 21, 2019, Shawe filed a notice of appeal to the Delaware Supreme Court from the court's October 17, 2019 memorandum opinion and the First Order.[147]

- On October 28, 2019, TPG and Shawe filed a motion for certification of an interlocutory appeal of the court's October 17, 2019 memorandum opinion and the First Order.[148]

- On November 12, 2019, TPG and Shawe filed a motion for certification of an interlocutory appeal of the Second Order and Records Confidentiality Order.[149]

---

[145] *See* Dkts. 1548, 1529 Ex. A, 1527, 1458 Ex. A, 1457 Ex. A, 1428, 1414 Ex. 2, 1407.

[146] *See* Notice of Appeal, *TransPerfect Glob., Inc. v. Pincus*, No. 439, 2019 (Del. Oct. 19, 2019), Dkt. 1.

[147] *See* Notice of Appeal, *TransPerfect Glob., Inc. v. Pincus*, No. 441, 2019 (Del. Oct. 21, 2019), Dkt. 1.

[148] Dkt. 1395.

[149] Dkt. 1405.

- On November 25, 2019, TPG and Shawe filed a notice of appeal to the Delaware Supreme Court from the Second Order and Records Confidentiality Order.[150]

On November 18, 2019, this court entered an order denying TPG and Shawe's October 28 motion for certification of interlocutory appeal.[151] The court explained that the "risk of piecemeal appeals" was "manifest," because two "matters directly related to the Opinion and the First and Second Orders remain outstanding: (i) the amount of the Contempt Fee Award and (ii) the resolution of any objections Respondents may make to the Fee Orders."[152] On November 27, 2019, the court issued a letter decision denying TPG and Shawe's November 12 motion for certification of interlocutory appeal for the same reasons.[153]

On December 2, 2019, TPG and Shawe filed a notice of interlocutory appeal from the Second Order and Records Confidentiality Order with the Delaware Supreme Court.[154]

On December 31, 2019, the Delaware Supreme Court dismissed the October 19, October 21, and November 25 direct appeals, finding the orders "do not fall

---

[150] *See* Notice of Appeal, *TransPerfect Glob., Inc. v. Pincus*, No. 501, 2019 (Del. Nov. 25, 2019), Dkt. 1.

[151] Dkt. 1410.

[152] *Id.* ¶ 9.

[153] Dkt. 1425.

[154] *See* Joint Notice of Appeal from an Interlocutory Order, *TransPerfect Glob., Inc. v. Pincus*, No. 509, 2019 (Del. Dec. 2, 2019), Dkt. 1.

within the collateral order doctrine," and refused the December 2 interlocutory appeal.[155] The Supreme Court noted that, "[a]s the Court of Chancery recognized, the amount of fees to be awarded to the Custodian pursuant to the First Order is unresolved."[156]

## T. Another Flurry of Motions and an Agreement to Mediate

The court's rulings on the Custodian's motion for contempt precipitated another flurry of motions by Respondents.

On December 19, 2019, Respondents filed a 48-page brief, a 31-page report from an expert, and numerous other materials in objection to the Custodian's fee petitions for fees and expenses incurred from May 2019 to October 2019 (the "Omnibus Objection").[157] On January 23, 2020, TPG filed a motion to clarify or modify the Second Order and the Records Confidentiality Order.[158] On February 6, 2020, Respondents filed a joint motion for contempt against the Custodian.[159] On February 26, 2020, Respondents file a joint motion to preclude the Custodian from

---

[155] *TransPerfect Glob., Inc. v. Pincus*, 224 A.3d 203, 2019 WL 7369433, at *2-3 (Del. Dec. 31, 2019) (TABLE).

[156] *Id.* at *2.

[157] Dkt. 1429.

[158] Dkts 1437-38. The court granted this motion (with modifications) on June 8, 2020. Dkt. 1495.

[159] Dkt. 1448.

receiving the Contempt Fee Award.[160]  At Respondents' request, a hearing on the first two motions scheduled for March 30, 2020 was postponed and later rescheduled for April 27.[161]

Sensing that the litigation was going off the rails at a time when the custodianship should be coming to an end, the court inquired on April 13, 2020 whether the parties would be willing to mediate their remaining disputes before former Chancellor Chandler—who graciously agreed to mediate free of charge.[162] The parties agreed to mediate two days later.[163]  For the next seven and half months, activity in these actions was essentially dormant while the parties engaged in mediation.  Nevertheless, Respondents continued to litigate grievances arising out of the sale process elsewhere.

## U.    TPG Sues Counsel the Custodian Hired to Represent TPG

On August 18, 2020, TPG sued the law firm Ross Aronstam & Moritz LLP ("RAM") and Garrett B. Moritz, a partner at the firm, in New York state court.[164]  In

---

[160] Dkt. 1469.

[161] *See* Dkts. 1476, 1480, 1483.

[162] Dkt. 1490.  The court expresses its sincere appreciation to the former Chancellor for his willingness to volunteer countless hours of his time to attempt to resolve the remaining deep-seated disputes in these actions as a service to the parties, the court, and the public.

[163] Dkts. 1491, 1492, 1493.

[164] *See* Dkt. 1539 Ex. A.

2017, the Custodian hired RAM to represent the Company in the Section 211 and 220 actions that Ms. Shawe filed as the sale process was underway.[165]

In its complaint, TPG alleges that RAM and Moritz committed legal malpractice when representing TPG by "having been retained by, and taken directions from, a conflicted agent for TransPerfect,"—namely the Custodian.[166] More specifically, the New York action alleges RAM and Moritz "recklessly or willfully followed the custodian's instructions, which were directly contrary to the interests of TransPerfect and solely operated to the benefit of the custodian" and "continued to collect tens of thousands of dollars in fees from TransPerfect while aiding and abetting a person with interests directly adverse to their client"—again referring to the Custodian.[167]

On November 19, 2020, RAM and Moritz moved to intervene in these actions for the limited purpose of filing a motion for contempt against TPG and Shawe.[168] The court granted the motion to intervene on December 16, 2020.[169] On April 14,

---

[165] *See* Dkt. 1539 Exs. C, F.

[166] Dkt. 1539 Ex. A ¶ 1.

[167] *Id.* ¶¶ 9, 10.

[168] Dkt. 1511.

[169] Dkt. 1538.

2021, after briefing and argument, the court denied the motion for contempt for the reasons explained in a letter decision.[170]

## V. Resumption of the Litigation and Another Collateral Attack

On November 30, 2020, after it became apparent that the mediation had reached an impasse, the court sent a letter to the parties explaining that "[o]ver seven months have passed" since the parties agreed to engage in mediation and that "the time has come to set firm deadlines to bring the Custodianship to a prompt conclusion."[171] The court set forth a briefing schedule for the motions pending before the court and provided that "the Custodian must file by no later than December 15, 2020, (i) any petition it intends to make for attorneys' fees and expenses that were not included in any prior fee petition and (ii) a petition to be discharged."[172] A hearing was scheduled for March 2, 2021 at 11 a.m. to hear these motions and any other outstanding motions.

On December 24, 2020, TPG and Shawe sued this judicial officer in the United States District Court for the District of Delaware.[173] Their complaint, as amended, asserted that the Second Order and Records Confidentiality Order violated

---

[170] *See* Dkt. 1599.

[171] Dkt. 1524 at 1.

[172] *Id.* at 2.

[173] Complaint for Violation of Civil Rights, *Shawe v. Bouchard*, No. 20-cv-1770 (D. Del. Dec. 24, 2020), Dkt. 1.

Shawe's First and Fourteenth Amendment rights.[174]  The district court dismissed this action on April 12, 2021.[175]

On March 2, 2021, at 10:28 a.m., about thirty minutes before the hearing scheduled to consider all the other motions at issue in this opinion, TPG and Shawe filed a motion for an award of attorneys' fees against the Custodian based on his alleged bad faith in the fee petition process.[176]  Eight minutes earlier, at 10:20 a.m., Citizens for a Pro-Business Delaware issued a press release describing the motion before it was filed with the court.[177]

## II.    ISSUES FOR DECISION

The core issue before the court is seemingly straightforward:  a request for judicial approval to reimburse a court-appointed custodian and his advisors for fees and expenses they incurred in connection with the performance of the custodian's

---

[174] *See Shawe v. Bouchard*, 2021 WL 1380598, at *1 (D. Del. Apr. 12, 2021).

[175] *Id.* at *18.  The action was dismissed, in part, on mootness grounds due to the court's modification of the Second Order and rescission of the confidentiality restrictions in the Records Confidentiality Order, which is discussed in Part V.B.3 below.

[176] Dkt. 1589.

[177] *See Citizens for a Pro-Business Delaware Renews Calls for Transparency in TransPerfect Court Case in Light of "Bad Faith" Attorney Fees from Skadden Arps*, Bus. Wire (Mar. 2, 2021 10:20 AM), https://www.businesswire.com/news/home/2021030 2005823/en/Citizens-for-a-Pro-Business-Delaware-Renews-Calls-for-Transparency-in-TransPerfect-Court-Case-in-Light-of-%E2%80%9CBadFaith%E2%80%9D-Attorney-Fees-from-Skadden-Arps ("*Today, following a motion from TransPerfect alleging "bad faith" fees from attorneys at Skadden Arps*, the company's court-ordered Custodian, Citizens for a Pro-Business Delaware renewed calls for transparency and access to today's hearing scheduled on the case." (emphasis added)).

duties. In these actions, however, the court's task is anything but straightforward given Shawe's insatiable appetite for litigation and proclivity to engage in scorched-earth tactics using an army of lawyers.

Between May 2019 and December 2020, the Custodian and his advisors incurred approximately $3.87 million in fees and expenses. The subject matter of the work performed falls into eighteen categories listed on a chart attached as Exhibit A to this opinion. On March 9, 2021, following oral argument, the Custodian withdrew his request with respect to $204,485 of this amount.[178] The withdrawn amount is allocated among four of the subject matter categories in Exhibit A under the "Administrative" column. The amount now at issue is approximately $3.66 million.

Respondents have attacked the Custodian's fee petitions in every way imaginable. They have filed three rounds of objections, consisting of approximately 192 pages of briefing and 108 pages from an expert.[179] The objections take issue with virtually every time entry in the fee petitions. Respondents also have filed three motions seeking to knock out certain categories of fees and expenses outright: one

---

[178] *See* Dkt. 1592 at 5. Respondents objected that $204,485 should be disallowed as "fees on fees" for expenses incurred in preparing fee petitions. Dkt. 1573 at 7. The Custodian contends these expenditures are appropriate and that the amount related to preparing fee petitions is less than $204,485, but has withdrawn his request for this amount "solely for purposes of mooting the dispute." Dkt. 1592 at 5.

[179] *See* Dkts. 1429, 1451, 1571, 1573, 1585, 1588.

styled as a motion for contempt, a second to preclude certain billings, and a third accusing the Custodian of bad faith over certain categories of expenses to which Respondents already had filed extensive objections.[180]

The court will address the mélange of issues Respondents have raised in four parts. Parts III and IV will address their motions for contempt and preclusion, respectively. Part V will address their three objections to the fee petitions and Part VI will address their belated "bad faith" motion.

## III. THE CONTEMPT MOTION

On February 6, 2020, Respondents filed a joint motion for an order to show cause why the Custodian and Skadden should not be held in contempt for violating the August 2015 Order and the Sale Order for "intentionally withholding the required Court-ordered monthly fee petitions" with respect to "work purportedly performed in November and December 2019."[181] As a sanction, they seek the "forfeiture of any unbilled fees or expenses purportedly incurred in November 2019

---

[180] *See* Dkts. 1448, 1469, 1589.

[181] Dkt. 1448 ¶¶ 1, 18.

and December 2019,"[182] which equates to approximately $374,000.[183] Respondents also assert that the Custodian should "be held responsible for any and all costs incurred by Respondents in connection with this Motion" under paragraph 3(e) of the Second Order.[184]

Court of Chancery Rule 70(b) authorizes the court to find a party in contempt for the "failure . . . to obey or to perform any order."[185] "To be held in contempt, a party must be bound by an order, have notice of it, and nevertheless violate it."[186] The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way."[187] "Whether a party should be held in contempt is a discretionary matter for the Court."[188] The "party petitioning for a finding of

---

[182] *Id.* ¶ 6.

[183] Respondents' contempt motion does not concern fees and expenses relating to the Contempt Fee Award, some of which were incurred during the November-December 2019 period. *See id.* at 6 n.4 (noting that "any fee application in connection with the Court's finding of contempt . . . is not governed by the August 15, 2015 and July 18, 2016 Orders"). Backing out the amounts attributable to the Contempt Fee Award, the balance of the fees and expenses incurred in November and December 2019 is $374,296. *See* Dkt. 1537 Ex. A (breaking down the total fees and expenses incurred in November and December 2019 ($203,242 and $214,266, respectively) and the portion attributable the Contempt Fee Award ($23,745 and $19,467, respectively)).

[184] Dkt. 1448 ¶ 22.

[185] Ch. Ct. R. 70(b).

[186] *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1181 (Del. Ch. 2009).

[187] *Dickerson v. Castle,* 1991 WL 208467, at *4 (Del. Ch. Oct. 15, 1991) (internal quotation marks omitted).

[188] *TransPerfect*, 2019 WL 5260362, at *10.

contempt bears the burden to show contempt by clear and convincing evidence."[189]

Any sanction imposed by the court for a contempt finding "should be directed towards coercing compliance with the order being violated and remedying the injury suffered by other parties as a result of the contumacious behavior."[190] "In all civil cases, a contempt determination must be coercive or remedial rather than punitive"[191] and the court must "use the least possible power adequate to the end proposed."[192]

Paragraph 10 of the August 2015 Order and paragraph 14 of the Sale Order both provide, in relevant part, that "[t]he Custodian shall petition the Court on a monthly basis, or such other interval as the Court may direct, for approval of fees and expenses."[193] Respondents contend the Custodian and Skadden violated these provisions by failing, as of February 6, 2020, to submit petitions for the fees and expenses they incurred during November and December 2019.[194]

---

[189] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 6338996, at *1 (Del. Ch. Dec. 4, 2018).

[190] *Aveta*, 986 A.2d at 1188 (Del. Ch. 2009).

[191] *Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4804792, at *2 (Del. Ch. Sept. 26, 2014) (internal quotation marks omitted).

[192] *TR Inv'rs, LLC v. Genger*, 2009 WL 4696062, at *18 n.74 (Del. Ch. Dec. 9, 2009) (quoting Am. Jur. 2D *Contempt* § 195), *aff'd,* 26 A.3d 180 (Del. 2011).

[193] Dkt. 607 ¶ 10; Dkt. 848 ¶ 14.

[194] *See* Dkt. 1448 ¶ 18.

The Custodian responds that he did not violate either the August 2015 Order or the Sale Order because those orders do not require "the Custodian to file fee petitions by or on a particular date."[195] According to the Custodian, those orders simply identify "the interval that must be covered by the Custodian's petitions," *i.e.*, "[a]pplications must cover a month period, not a longer interval."[196] The Custodian further explains that TPG and Shawe "[a]t most . . . have raised an interpretive dispute" and there "has been no injury or prejudice to anyone."[197]

As an initial matter, the contempt motion proceeds from the counter-intuitive premise that the Custodian was motivated to delay when he and his advisors would be paid. The opposite premise is more logical, *i.e.*, there would be no reason for the Custodian to delay seeking payment. In that vein, the Custodian's contemporaneous explanation for the delay makes perfect sense.

On February 10, 2020, four days after the contempt motion was filed, the Custodian explained in a letter to the court that he had "not sought Skadden's bills for November and December" and had "not submitted petitions for those months" because he believed it would promote efficiency for purposes of future fee petitions to have the benefit of the court's ruling on Respondents' then-pending Omnibus

---

[195] Dkt. 1533 ¶ 28.

[196] *Id.* ¶ 29.

[197] *Id.* ¶ 39.

47

Objection concerning fees and expenses incurred from for May to October 2019.[198]

Having now pored through 74 pages of briefing from Respondents and 45 pages from their expert relating to the Omnibus Objection[199] and seen firsthand the extent to which it covers the same ground as Respondents' later objections, it is apparent that the Custodian's position was sensible and asserted in good faith. Putting that issue aside, Respondents have failed to meet their burden to show contempt by clear and convincing evidence for two independent reasons.

First, the key phrase in the court orders at issue—"monthly basis"—is too vague as used in those orders to support a finding of contempt. Respondents and the Custodian each have advanced a reasonable interpretation of the phrase as it appears in the orders, *i.e.*, that (i) the Custodian must file a fee petition each month for the prior month, although the orders do not impose a specific deadline for the filing—as Respondents contend;[200] or (ii) the Custodian may decide in his discretion when to file a fee petition but must provide billing information in monthly intervals (*i.e.*, on a "monthly basis") when he does so—as the Custodian contends. "A cardinal requirement for any adjudication of contempt is that the order allegedly violated give

---

[198] Dkt. 1450 Ex. 1 at 3.

[199] *See* Dkts. 1429, 1451.

[200] Contrary to Respondents' position, the Custodian previously filed a petition seven weeks after the end of a month without objection from Respondents. *See* Dkt. 1412 (petition filed on November 21, 2019, for fees and expenses incurred as of September 30, 2019).

clear notice of the conduct being proscribed."[201]  Here, it is ambiguous what the phrase "monthly basis" was intended to mean.  Thus, the Custodian was not provided "clear notice" that he was required to file fee petitions each month for the prior month and cannot be held in contempt for failing to do so.

Second, even assuming *arguendo* the Custodian had clear notice that he was required to file petitions for fees and expenses incurred in November and December 2019 by some undefined date before the end of the next month, his failure to do so was nothing more than a technical breach that did not prejudice Respondents.[202]  Had the Custodian filed the fee petitions at issue here on February 7, 2020, the day after the contempt motion was filed, Respondents certainly could not be heard to argue they were prejudiced by having to wait one to five additional weeks to receive that information.[203]  As highlighted by Part V below, furthermore, the exhaustive

---

[201] *Mother Afr. Union First Colored Methodist Protestant Church v. Conf. of Afr. Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992), *aff'd*, 633 A.2d 369 (Del. 1993) (TABLE).

[202] *See Mitchell Lane Publ'rs, Inc.*, 2014 WL 4804792, at *3 (declining to hold plaintiff in contempt when "Defendants have not suffered any real injury from [plaintiff's] technical violation").

[203] Even under Respondents' interpretation, the fee petitions for time incurred in November and December 2019 would not have been due until December 31, 2019 and January 31, 2020, respectively, given the lack of any specific deadline in the August 2015 Order or the Sale Order for filing fee petitions.

49

submissions Respondents filed in opposition to the Custodian's petitions for fees and expenses incurred in November and December 2019[204] belie any credible suggestion they were hampered in their ability to challenge those amounts by receiving the billing records when they did.[205]

For the reasons explained above, Respondents' motion for contempt is denied.

## IV.    THE PRECLUSION MOTION

On February 26, 2020, Respondents filed a joint motion for an order precluding the Custodian from receiving attorneys' fees and expenses to make the Custodian and his advisors whole for work they performed to address TPG and Shawe's contempt of court (as defined above, the "Contempt Fee Award").[206] The order documenting the Contempt Fee Award was entered on October 17, 2019 and modified on November 1, 2019.[207] The amount the Custodian seeks for the Contempt Fee Award is approximately $1.15 million, which covers fees and

---

[204] *See* Dkts. 1571, 1588.

[205] Respondents acknowledge they were afforded access to these billing records in mid-2020 during mediation before former Chancellor Chandler. Dkt. 1546 ¶ 7. The formal petition for these fees and expenses was filed on December 15, 2020. Dkts. 1536, 1537, 1540 (corrected filing). The circumstances of this delay are addressed in Part IV below.

[206] Dkt. 1469.

[207] Dkts. 1379, 1399.

expenses related to (i) defending against the improperly filed Nevada Action and (ii) successfully prosecuting the motion for contempt of the Final Order.[208]

In the preclusion motion, Respondents contend the Custodian should forfeit the entire Contempt Fee Award because, as of February 26, 2020, the Custodian had "failed to file the required fee petitions and billing records" for receipt of court approval for the amount involved.[209] More specifically, Respondents argue that the Custodian's delay in petitioning the court to approve the Contempt Fee Award (i) was an "improper attempt to prejudice Respondents by blocking them from appealing the contempt sanctions set forth in the First Order"[210] and (ii) constitutes a "waiver."[211] Both grounds are without merit.

Some background is important to understand this motion. After the court found TPG and Shawe in contempt for filing the Nevada Action in violation of the exclusive jurisdiction provision in the Final Order, they each sought to appeal that decision by filing motions for interlocutory review and three direct appeals to the Delaware Supreme Court even though this court had not yet determined the amount of the Contempt Fee Award.[212] On December 31, 2019, the Delaware Supreme

---

[208] *See* Dkt. 1399 ¶ 7.

[209] Dkt. 1470 ¶ 15.

[210] *Id.* ¶ 3.

[211] *Id.* ¶ 19.

[212] *See* Dkts. 1382, 1395, 1405, 1422; *TransPerfect*, 2019 WL 7369433, at *1-2.

51

Court dismissed all of their direct appeals for failing to "fall within the collateral order doctrine" and refused a request they made for interlocutory review,[213] which this court previously rejected based on the strong policy against piecemeal appeals.[214]

This context highlights the draconian relief Respondents seek. In their motion, Respondents concede that "the Contempt Fee award did not fix a set time for filing the mandated fee application."[215] Despite this concession, Respondents seek forfeiture of a fee award intended to reimburse the Custodian and his counsel for fees and expenses they were forced to incur *due to TPG and Shawe's own contumacious conduct* simply because the Custodian did not file that fee application within two months of the Supreme Court's rejection of Respondents' numerous premature appeals based on the Custodian's good faith belief that it would be more efficient for the court to resolve the Omnibus Objection first[216]—before the parties expended additional resources briefing objections to subsequent fee petitions.[217]

---

[213] *TransPerfect*, 2019 WL 7369433, at *2.

[214] Dkts. 1410, 1425.

[215] Dkt. 1470 ¶ 16.

[216] *See supra* Part III.

[217] *See* Dkts. 1450 Ex. 1 at 3, 1474 at 2-4.

Respondents cite no court rule or case authority to support such an extreme and inequitable result, which the court rejects.[218]

As importantly, Respondents' subsequent conduct betrays their assertion of prejudice. On April 15, 2020, after the parties agreed to mediate their remaining disputes, TPG's counsel confirmed that an April 27 hearing to consider the Omnibus Objection would be adjourned.[219] Thereafter, contrary to their assertion of prejudice, *Respondents made no effort to press for resolution of the open issues concerning the Contempt Fee Award for the next seven and one-half months*.

On November 30, 2020, when it became apparent the mediation had reached an impasse, the court intervened and set a schedule to resolve the remaining

---

[218] Respondents misplace reliance on *Maurer v. International Re-Insurance Corp.*, 96 A.2d 347 (Del. Ch. 1953) and *Mattel, Inc. v. Radio City Entertainment*, 210 F.R.D. 504 (S.D.N.Y. 2002) for the proposition that "the failure to submit the requisite Contempt Fee Award application constitutes undue and unreasonable delay as a matter of law constituting waiver of any right to recover fees and expenses." Dkt. 1470 ¶ 19. In *Maurer*, this court denied a petition for reimbursement based on laches, finding that the delay in filing the petition was prejudicial because it "seriously interfere[d] with the proper winding up of the receivership" and the petitioners "had notice through their attorney that this court desired all applications for fees to be filed promptly so that the notice to be sent interested parties would contain a reference thereto." *Maurer*, 96 A.2d at 348. Here, no deadline was in place for filing the Contempt Fee Award petition and Respondents' assertion of prejudice is without merit. In *Mattel*, the federal court denied a motion for attorneys' fees because "Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure prescribes a tight time limit for any motion for attorneys' fees, to wit, within 14 days of the entry of judgment." *Mattel*, 210 F.R.D. at 505. That rule has no application here.

[219] Dkt. 1492. The April 27 hearing had been scheduled to occur on March 30 but was postponed at TPG and Shawe's request. Dkt. 1480 at 2.

motions.[220] The Custodian then promptly filed, on December 15, 2020, a petition for fees and expenses incurred from November 2019 to November 2020, a motion for an order of discharge, and oppositions to the contempt and preclusions motions.[221] Given these circumstances, in particular Respondents' lengthy abandonment of any expressed concern for resolving the Contempt Fee Award more promptly, the record belies any credible suggestion of prejudice to Respondents to warrant preclusion of the Custodian's fee application relating to the Contempt Fee Award.

The second ground of the preclusion motion—waiver—is frivolous. Waiver involves "the voluntary and intentional relinquishment of a known right."[222] Respondents have provided no evidence that the Custodian intended to relinquish his right to be reimbursed for fees and expenses he and his counsel were forced to incur as a result of TPG and Shawe's contempt of court. To the contrary, the record reflects that the Custodian fully intended to seek the Contempt Fee Award and merely disagreed with Respondents about the timing for doing so.

For the reasons explained above, Respondents' preclusion motion is denied.

---

[220] Dkt. 1524.

[221] Dkts. 1533-37.

[222] *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529 (Del. 2011).

## V. THE OBJECTIONS

This section addresses objections Respondents filed in three tranches to the Custodian's petitions for fees and expenses incurred from May 2019 through December 2020: (i) the first was filed on December 23, 2019, for fees and expenses incurred from May through October 2019 totaling $242,886 (as defined above, the "Omnibus Objection");[223] (ii) the second was filed on January 29, 2021, for fees and expenses incurred from November 2019 through November 2020 totaling $3,164,510 (the "Second Objection");[224] and (iii) the third was filed on February 2, 2021 for fees and expenses incurred in December 2020 totaling $460,966 (the "Third Objection").[225] Given the substantial overlap of the legal and factual issues, the court

---

[223] *See* Dkt. 1429. Unless otherwise noted, all numbers are rounded to the nearest dollar in this opinion and the chart attached as Exhibit A hereto.

[224] *See* Dkt. 1571.

[225] *See* Dkt. 1573. In its November 30, 2020 letter, the court directed the Custodian to make several filings by December 15, 2020, including "any petition [the Custodian] intends to make for attorneys' fees and expenses that were not included in any prior fee petition." Dkt. 1524 at 2. Construing these words illogically, Respondents contend the court should (i) cut off the Custodian's right to recover any fees and expenses incurred after December 15, 2020 and (ii) deny reimbursement for any fees and expenses incurred between December 1-15, 2020 (totaling about $383,000) because they were sought in a petition filed after December 15. Dkt. 1573 at 5-6. As the court explained during the March 2, 2021 hearing, it would make no sense to impose a December 15, 2020 hard stop on the Custodian's right to recover fees and expenses. Oral Arg. Tr. at 141 (Mar. 2, 2021) (Dkt. 1595). Indeed, Respondents' own proposed discharge order recognized that the Custodian was entitled post-discharge to "retain the same protections and indemnification rights granted to him under the Securities Purchase Agreement, the Sale Order and the Final Order in his individual capacity as he has had in his capacity as Custodian." *See* Dkt. 1566. As to the second point, it is preposterous for Respondents to suggest that the Custodian

55

will address the three tranches of objections together. The total amount of fees and expenses that remains at issue following the Custodian's withdrawal of $204,485 in fees is $3,663,878.

Respondents' objections to the Custodian's fee petitions fall into two categories: (i) general objections that apply to all of the fees and expenses incurred regardless of the subject matter for which they were incurred and (ii) objections that are specific to the subject matter for which certain fees and expenses were incurred.

Respondents' general objections are based almost exclusively on opinions expressed in a series of reports by David H. Paige,[226] the managing director of a "legal fee advising firm," who holds himself out "as an expert regarding the billing practices of Robert Pincus, Esq. and the firm, Skadden, Arps, Slate, Meagher & Flom, LLP."[227] According to Paige's report included with the Second Objection— which constitutes the lion's share of the amount at issue—the Custodian's fees and expenses should be reduced by 56% based on the general objections alone.[228] This amount fluctuates slightly between the three objections, based primarily on unexplained and seemingly arbitrary changes in the reductions Paige recommends.

should forfeit his right to seek reimbursement for fees and expenses incurred during the first half of December because they were included in a fee petition covering the full month, which was filed promptly on January 8, 2021. Dkts. 1554, 1555.

[226] *See* Dkt. 1429 Ex. B; Dkt. 1571 Ex. A; Dkt. 1573 Ex. A.

[227] Dkt. 1429 Ex. B at 3.

[228] Dkt. 1571 Ex. A at 7, 25.

For example, Paige increased the reduction for "Excessive Hourly Rates" from 30% in his report filed with the Omnibus Objection to 40% in later reports without any substantive explanation.[229]

Wholly apart from their general objections, Respondents seek additional reductions to the fees and expenses incurred for specific subject matters, contending that the Custodian is not legally entitled to recover certain of those amounts.[230] As a fallback position to their assertion that certain amounts must be categorically excluded, Respondents repeatedly refer to and reiterate Paige's 56% figure in their Second Objection.[231] By my calculations, based on their general and specific objections, Respondents seek a total reduction of the amount of fees sought in the petitions of approximately 75% of the amount still at issue.[232]

---

[229] *Compare* Dkt. 1429 Ex. B at 12 ("Accordingly, I conservatively recommend that the Total Fees be reduced by at least 30%, based solely upon the Wolters Kluwer rate analysis."), *with* Dkt. 1571 Ex. A at 13 ("Accordingly, I conservatively recommend that the Total Fees be reduced by at least 40%, based solely upon the Wolters Kluwer rate analysis . . . .").

[230] *See* Dkt. 1429 at 16; Dkt. 1571 at 42.

[231] *See* Dkt. 1571 at 22, 26, 52, 56, 57; Dkt. 1588 at 17, 32.

[232] Respondents seek to categorically exclude over $1.6 million in fees and expenses. *See generally* Dkt. 1429 at 22-29, 32-36; Dkt. 1571 at 14-38; Dkt. 1573 at 5-6, 8, 10-11. Cutting the remaining roughly $2 million in fees by an additional 56%—as Respondents and Paige recommend—leaves a balance of approximately $900,000. Respondents do not provide an exact amount in fees and expenses they contend is reasonable.

The overarching issue underlying Respondents' objections is the reasonableness of the fees and expenses charged. Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct provides that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses."[233] Rule 1.5(a) recites eight non-exhaustive factors "to be considered in determining the reasonableness of a fee":

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.[234]

---

[233] Del. Lawyers' R. Prof'l Conduct 1.5(a).

[234] *Id.*; *see also Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 246 (Del. 2007) ("To assess the reasonableness of EDIX's award for attorneys' fees and other expenses, we consider the factors identified in Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct and [relevant] case law." (alteration in original) (internal quotation marks omitted)).

The court turns next to consider the general and specific objections, in turn.

## A. The General Objections

Respondents' general objections fall into three categories that track Paige's reports, namely objections for (i) for "excessive hourly rates," (ii) "inappropriate timekeepers" and "non-billable disbursements," and (iii) "generally objectionable billing practices."[235] The court addresses each of those categories next.

### 1. Hourly Rates

From May 2019 to December 2020, the Custodian charged $950 per hour for his time, which reflected a reduced rate following his retirement from Skadden as of December 31, 2018.[236] During this same period, the rates Skadden charged fell within the following ranges:

---

[235] In his reports, Paige reduces the Custodian's fees and expenses by taking three steps: (i) eliminating fees for "inappropriate timekeepers" and expenses for "non-billable disbursements"; (ii) then reducing fees by 30% or 40% for "excessive hourly rates"; and (iii) then reducing fees by 20% for "generally objectionable billing practices." *See* Dkt. 1429 Ex. B at 6; Dkt. 1571 Ex. A at 6-7; Dkt. 1573 Ex. A.

[236] Dkt. 1281 Ex. 1 at 3. Pincus represents that his $950 per hour rate was the amount he had been "charging for non-Skadden mediation and consulting matters on which [he] worked since [he] became Of Counsel on April 1, 2018." *Id.*

| Position | Hourly Rate Range |
|---|---|
| Partner[237] | $ 1,225 to 1,775 |
| Counsel | $ 1,200 |
| Associate | $ 695 to 1,120 |
| Law Clerk | $ 475 |
| Paralegal/Legal Assistant | $ 180 to 495 |

Respondents do not specifically take issue with the rate the Custodian himself charged during the period in question. Rather, their contention is that Skadden's overall rates "are extraordinarily, indeed outrageously, unreasonable by any measure."[238] The court disagrees. In my opinion, a firm of Skadden's stature was necessary to support the Custodian under the circumstances of this case and the hourly rates Skadden charged are reasonable because they are consistent with the rates Skadden charges other clients, as the court's orders require, and are in line with the rates of firms that can fairly be considered Skadden's peers. Skadden's hourly rates also reflect the complexity of the work performed and the results obtained both during the sale process and after the closing.

The August 2015 Order, which the court entered after trial when granting judgment in Elting's favor under 8 *Del. C.* § 226, expressly provides that "[t]he Custodian shall be compensated at the usual hourly rate he charges as a partner of

---

[237] Timekeeper N, a tax partner, billed 1.6 hours at a rate of $1,775 per hour and 6.2 hours at $1,695 per hour. *See* Dkt. 1441 App. A; Dkt. 1540 Ex. A. No other partner at Skadden billed over $1,565 per hour. *See* Dkt. 1441 App. A; Dkt. 1540 Ex. A; Dkt. 1555 Ex. A.

[238] Dkt. 1429 at 38.

Skadden" and that "[t]he fees of any counsel or advisors" retained by the Custodian—"including Skadden"—"shall be calculated on the same hourly rates charged by such counsel or advisors to clients represented outside this matter."[239] The Sale Order, entered on July 19, 2016, again expressly authorized the Custodian "to utilize the services of Skadden" and contained substantively identical provisions governing the hourly rates the Custodian and his counsel may charge.[240] As reflected in the Final Order, entered on February 18, 2018, these provisions remained in place throughout the May 2019 to December 2020 period.[241]

On March 9, 2021, Jennifer Voss, Skadden's lead litigation partner in these actions, submitted an affidavit attesting that she had reviewed the outstanding fee petitions, which cover fees and expenses Skadden incurred from May 2019 to December 2020; that the fees and expenses in those petitions "are reasonable for the tasks performed"; and that "[t]he hourly rates charged by Skadden in this matter are consistent with the hourly rates charged by Skadden (including by the Delaware

---

[239] Dkt. 607 ¶¶ 10-11. The Initial Order appointing Pincus as a custodian to serve as a mediator contained the same provisions. *See* Dkt. 515 ¶¶ 7-8.

[240] Dkt. 848 ¶¶ 7, 14.

[241] Dkt. 1243 ¶ 8 ("The rights and authority granted to the Custodian . . . under the Sale Order and all other orders of the Court in Civil Action Nos. 9700-CB and 10449-CB shall remain in full force and effect in accordance with their terms until otherwise modified or discharged by the Court.").

office of Skadden) to clients represented outside this matter."[242] The Custodian also provided filings from three actions where federal courts approved applications in 2019 to compensate Skadden at rates in line with the rates set forth above.[243] Voss's affidavit and these filings confirm that Skadden's rates in the outstanding petitions complied with this court's orders.

In addition, the Custodian provided filings from actions—including seven in Delaware—where federal courts approved fee applications for twelve other firms whose hourly rates were in line with the rates Skadden charged here.[244] These twelve firms,[245] which the court would consider peers of Skadden, include Shawe's lead trial counsel when the Custodian was appointed: Sullivan & Cromwell LLP.[246]

---

[242] Dkt. 1593 ¶¶ 3-4, 6. The court asked Skadden to provide such an affidavit at oral argument. *See* Oral Argument Tr. at 137-38 (Mar. 2, 2021) (Dkt. 1595).

[243] *See* Dkt. 1441 App. B at Exs. F, J, M.

[244] *See* Dkt. 1441 App. B at Exs. A-E, G-I, K-L, N-O.

[245] The twelve firms are: Debevoise & Plimpton LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Simpson Thacher & Barlett LLP; Davis Polk & Wardell LLP; Kirkland & Ellis LLP; Baker Botts LLP; Wachtell, Lipton, Rosen & Katz; Sullivan & Cromwell LLP; Weil, Gotshal & Manges LLP; Latham & Watkins LLP; Gibson, Dunn & Crutcher LLP; and Wilson Sonsini Goodrich & Rosati, P.C. *Id.*

[246] Dkt. 1441 App. B at Ex. I. The 2019 filing for Sullivan & Cromwell disclosed the following hourly rates: $1,275 to $1,560 for partners, $595 to $1,040 for associates, and $335 to $480 for legal assistants. *Id.* ¶ 8. In its filing for court approval of its fee and expense request, Sullivan & Cromwell represented that it "does not ordinarily determine its fees solely on the basis of hourly rates," that the ranges it provided were "determined with reference to the rates charged by other leading law firms for similar work," and that the "rates for the more senior timekeepers in each class represent a discount from the rates currently used by S&C when preparing estimates of fees . . . for non-bankruptcy engagements." *Id.* ¶¶ 7-8.

As important as the fact that the rates Skadden charged were specifically authorized under this court's orders, is the reason the court entered those orders in the first place. From the beginning, these actions were extraordinarily contentious. Shortly before trial, the parties deluged the court with twelve discovery and *in limine* motions.[247] The day before trial, Elting filed a motion for sanctions alleging extremely serious acts of misconduct by Shawe, which ultimately led to the imposition of a sanction against Shawe of approximately $7.1 million.[248] After completing a six-day trial, two things were painfully clear to the court concerning the selection of a custodian.

First, it was clear that the custodian and his counsel needed to have the necessary M&A knowledge and experience to conduct a sale process for a substantial company—one that earned almost $80 million in net income on over $470 million in revenues the year before trial and that ended up being valued at approximately $770 million.[249] Second, and more directly relevant here, the custodian needed to have a firm with the experience, resources, and ability to deal with Shawe, a serial litigator who vehemently opposed the sale process, exhibited irrational and erratic behavior, and demonstrated a willingness to do pretty much

---

[247] *In re Shawe & Elting, LLC*, 2015 WL 4874733, at *24.

[248] *See supra* Part I.D.

[249] *Shawe & Elting LLC*, 2015 WL 4874733, at *4; *TransPerfect*, 2018 WL 904160, at *12.

anything to get his way without regard for the cost. For example, as the court found, "Shawe threatened to shut down the entire Company" and "dismantle this place" on multiple occasions if Elting did not give in on matters where they disagreed,[250] and "bullied Elting and those aligned with her, expressing his desire to 'create constant pain' for Elting until she agreed with Shawe's plans."[251] Given these circumstances, it was essential that the custodian have the ability to utilize the full resources of his firm (Skadden) and that they both be compensated fairly for their time, *i.e.*, at the rates they would charge other clients.[252]

---

[250] *Shawe & Elting LLC*, 2015 WL 4874733, at *5.

[251] *Shawe v. Elting*, 157 A.3d at 157.

[252] As the court feared might happen, Shawe attempted to impede the sale process, driving up the cost along the way. Various litigations Shawe pursued for this purpose are described in Part I. In addition, Shawe "refused to sign a management representation letter that was necessary for Grant Thornton to complete its audit" until "the Custodian threatened to exclude [him] from the sale process." *TransPerfect*, 2018 WL 904160, at *17. Late in the process, furthermore, Shawe contended that Wordfast LLC—an entity Shawe and Elting owned on a 50–50 basis—was owed "a material amount of fees from 2006 forward [from the Company] and, upon a sale [of the Company] to a third party, likely would be facing annual fees of up to $10 million to use Wordfast's technology." *Id.* at *9. To address this issue, the Custodian "filed an application for a declaration that the Company and/or its subsidiaries held a non-exclusive, irrevocable, and royalty-free implied license to use any and all software and source code owned by Wordfast." *Id.* at *10. On the night before Shawe's deposition was to be taken in connection with an expedited hearing the court had scheduled concerning the Wordfast dispute, "Shawe and Ms. Shawe filed a notice of removal of the Wordfast matter to the United States District Court for the District of Delaware," which "necessitated cancellation of the evidentiary hearing unless and until the district court remanded the case." *Id.* The controversy over Wordfast contributed to one bidder dropping out of the sale process. *Id.*

In his reports, Paige asserts that Skadden's hourly rates are more than double what he refers to as "applicable mean market rates" and must be reduced by 30% or 40%, depending on the report.[253] Paige reaches this conclusion by comparing Skadden's rates to two sets of data compiled by Wolters Kluwer. In my opinion, neither comparison provides a reliable basis upon which to conclude that Skadden's rates were not reasonable under the circumstances of this case.

Paige first compares Skadden's hourly rates "to the mean hourly rates for firms engaged in bankruptcy and collection matters in Wilmington, DE, during the period in question,"[254] using data limited to "firms with 201-500 lawyers."[255] According to Paige, these data reflect "rates charged by similar firms for similar work."[256] Paige fails to provide, however, any basis for either conclusion. First, Paige provides no analysis to support his assumption that "bankruptcy and collection matters" constitute "similar work" to the services the Custodian and Skadden

---

[253] Dkt. 1429 Ex. B at 12; Dkt. 1571 Ex. B at 12-14; Dkt. 1573 Ex. A. As noted above, this shift from 30% in Paige's "first report" to 40% in later reports is unexplained and seemingly arbitrary.

[254] Dkt. 1429 Ex. B at 11; *see also* Dkt. 1571 Ex. A at 12.

[255] Dkt. 1429 Ex. B at 11-12; *see also* Dkt. 1571 Ex. A at 12. In his second report, filed with the court on January 29, 2021, Paige included an additional comparison between Skadden's rates and the rates charged in "Bankruptcy and Collection matters in Philadelphia, PA [which includes Wilmington, DE] for Firms with more than 1,000 Lawyers." Dkt. 1571 Ex. A at 12. This additional comparison suffers the same flaws as the other two comparisons. The work Skadden performed throughout these actions did not concern "bankruptcy and collection matters."

[256] Dkt. 1429 Ex. B at 11; Dkt. 1571 Ex. A at 12.

rendered here—none of which involved a bankruptcy or collections matter. Second, despite his admission that "firm size is a large factor in determining hourly rates,"[257] Paige provides no basis for his conclusion that firms with 201-500 lawyers are "similar firms" to Skadden, a global firm with more than 1,700 lawyers.[258] The unsubstantiated and grossly apples-to-oranges nature of Paige's first comparison makes it unreliable on its face.

Paige's second comparison "analyzed the Custodian's rates against the mean hourly rates for firms with more than 1,000 lawyers engaged in corporate matters in Wilmington, DE, during the period in question."[259] Although facially closer to the mark, this comparison suffers from similar deficiencies. Paige provides no elaboration for what constitutes "corporate matters" as used in the data samples and again makes no comparison to the services that Skadden performed in these actions. Additionally, beyond merely controlling for firm size, Paige's reports lack any explanation for how the firms in the sample actually compare to Skadden. No visibility is provided as to how many and which firms are included in the data samples to enable the court to assess their comparability to Skadden. As

---

[257] Dkt. 1429 Ex. B at 12; Dkt. 1571 Ex. A at 12.

[258] Dkt. 1441 at 36.

[259] Dkt. 1429 Ex. B at 12; *see also* Dkt. 1571 Ex. A at 13. Although the quote refers to firms in "Wilmington, DE," the actual data is based on firms in Philadelphia, PA and includes Wilmington. *See* Dkt. 1429 Ex. B at 12; Dkt. 1571 Ex. A at 13.

significantly, Paige does not provide any persuasive explanation for why the twelve firms referenced above—whose hourly rates are in line with the rates charged here—are not more reflective of Skadden's peers.[260] In sum, as with his other rate comparison, the second comparison in Paige's report does not provide a reliable basis to conclude that Skadden's hourly rates are not reasonable.

Critically, Paige's reports focus myopically on only one of the Rule 1.5(a) factors—"the fee customarily charged in the locality for similar legal services"[261]—and make no effort to consider any of the other Rule 1.5(a) factors that "case law directs a judge to consider" in determining reasonableness.[262] Paige does not analyze or consider, for example, "the experience, reputation, and ability" of the Custodian and other attorneys at Skadden, "the amount involved and the results obtained" throughout the custodianship or the sale process, or "the novelty and difficulty of the questions involved" in these actions.[263] Indeed, Respondents

---

[260] Respondents contend that the rates of these twelve firms consist of "approved rates in Bankruptcy cases mostly in New York City." Dkt. 1588 at 5. This is incorrect. In fact, of the sixteen cited cases, eight were in Delaware, five were in New York, two were in Texas, and one was in Oklahoma. *See* Dkt. 1441 App. B.

[261] Del. Lawyers' R. Prof'l Conduct 1.5(a)(3).

[262] *Mahani*, 935 A.2d at 245-46 (citation omitted).

[263] Del. Lawyers' R. Prof'l Conduct 1.5(a).

67

concede that Paige "was not privy to Skadden's work product, nor in a position to evaluate the relative complexity or simplicity of the legal issues involved."[264]

Consideration of the other Rule 1.5(a) factors reinforces the court's conclusion that Skadden's hourly rates were reasonable in this case. As discussed above, when selecting Pincus to be Custodian, the court believed it was imperative that he have the experience, resources, and ability of a firm of Skadden' stature at his disposal because of the challenges the court foresaw in implementing the remedy. Despite Shawe's consistent efforts to undermine the sale process, the Custodian with Skadden's assistance ran a successful modified auction in accord with the court's directive "to sell the Company with a view toward maintaining the business as a going concern and maximizing value for the stockholders."[265] Shawe later conceded as much in an appellate brief: "The Custodian and his consultants created a court-approved auction process, ran an extended auction, selected a winner, and recommended the sale of TPG to Shawe for economic and non-economic reasons, which fulfilled the Custodian's dual mandate."[266]

After the sale process concluded, the Custodian was forced to deal with collateral litigations and motions pressed by Respondents, which he and his advisors

---

[264] Dkt. 1571 at 7 n.5.

[265] *Shawe & Elting LLC*, 2015 WL 4874733, at *32.

[266] Answering Br. of Resp't-Below Appellee Philip R. Shawe at 46, *Elting v. Shawe*, No. 90, 2018 (Del. April 5, 2018), Dkt. 18.

handled with similar skill, often under significant "time limitations imposed by . . . circumstances" Respondents created.[267]  The Contempt Fee Award, which accounts for almost one-third of the fees at issue, is case in point.  In violation of this court's orders, the Company filed suit against the Custodian in Nevada over the amount owed under the Fee Orders and failed to stand down even in the face of a contempt motion, necessitating that the Custodian simultaneously—and successfully—litigate in two forums at once under significant time pressures.[268]

Finally, as an equitable matter, Respondents cannot "be heard to complain" that the amount Skadden charged for work performed after the sale process was "excessive when [they] may be blamed for so much of the cost."[269]  Knowing full-well that Skadden had been representing the Custodian on a non-contingent basis since the inception of the custodianship and was entitled to be paid at the rates it charged other clients, Shawe chose to go to battle with the Custodian rather than to cooperate during the wind-up process—acting in contempt of court, filing baseless motions and appeals, and quarreling with virtually every time entry in the

---

[267] Del. Lawyers' R. Prof'l Conduct 1.5(a)(5).

[268] *TransPerfect*, 2019 WL 5260362, at \*9, \*13.

[269] *EDIX Media Grp., Inc. v. Mahani*, 2007 WL 417208, at \*2 (Del. Ch. Jan. 25, 2007) (refusing to reduce fees awarded to plaintiff when, "[w]ith ample opportunity to minimize the costs of litigation, defendant at every step chose to draw out the conflict"), *aff'd*, 935 A.2d 242 (Del. 2007).

Custodian's fee petitions.[270]   As noted above, the Custodian deftly opposed this onslaught of attacks.   The results obtained and the skill he and his counsel demonstrated throughout these actions reinforces the reasonableness of the Custodian and Skadden's hourly rates.

### 2.   Billing for Non-Attorney Time and Certain Expenses

Respondents argue that the Custodian and Skadden should not be reimbursed for non-attorney time and "other administrative expenses" because such reimbursement "is improper under applicable legal, commercial and ethical billing practices, in which such non-professional costs are subsumed in law firm overhead."[271]   In the alternative, Respondents argue "if the Court were to allow some amount of non-attorney fees, . . . those fees should be limited to cost, not profit

---

[270] As part of their Omnibus Objection, Respondents submitted an affidavit from Adam Mimeles, TPG's general counsel.  Mimeles identifies numerous law firms and attorneys Respondents hired after Shawe lost at trial and the hourly rates they charged for working on various matters at issue in the Custodian's fee petitions.  *See* Dkt 1429 Ex. A ¶¶ 5-7. These hourly rates are irrelevant.  As Respondents note, they "are free to hire and to utilize as many attorneys and advisors as they desire" and pay those attorneys or advisors whatever hourly rates they can negotiate.  Dkt. 1588 at 31.  But Respondents' decision— after being represented at trial and on appeal of the Sale Order by Sullivan & Cromwell LLP and a prominent Delaware law firm—to switch to law firms charging lower hourly rates has no bearing on whether Skadden's rates are reasonable for purposes of this motion. Skadden was engaged at the outset of these actions and developed vast institutional knowledge and experience.  The Custodian was not obligated to switch counsel after the sale transaction closed, of course, and it would have been illogical and inefficient for him to do so as Shawe continued his attacks on the Custodian.

[271] Dkt. 1429 at 37.

centers for Skadden at TPG's or the Escrow's expense."[272]  In total, Respondents seek a reduction of $167,711 in fees for "Inappropriate Timekeepers" and a reduction of $194,980 for "Non-Billable Disbursements."[273]

### a.     Non-Attorney Timekeepers

In his reports, Paige contends that Skadden should not be reimbursed for any entries in its billing records attributable to "Legal Assistants," "Legal Assistant Specialists," "Client Specialists," and "Law Clerks."[274]  Paige attempts to distinguish these classifications from paralegals, asserting that they "appear to be non-professionals," which he defines as "non-lawyers and non-paralegals."[275]  The court disagrees with Paige's proposed exclusion of these time entries.

To start, Paige provides no support for defining "legal assistants" as "non-professionals."   This lack of support is unsurprising, given that ABA Model Guidelines use the terms "legal assistant" and "paralegal" interchangeably. Specifically, the 2018 ABA Model Guidelines for the Utilization of Paralegal Services explains that:

> In 1986, the ABA Board of Governors approved a definition for the term "legal assistant." In 1997, the ABA amended the definition of legal assistant by adopting the following language: "*A legal assistant or*

---

[272] *Id.*

[273] *See* Dkt. 1429 Ex. B at 6; Dkt. 1573 Ex. A.

[274] Dkt. 1429 Ex. B at 9; Dkt. 1571 Ex. A at 9.

[275] Dkt. 1429 Ex. B at 9.

*paralegal* is a person qualified by education, training or work experience who is employed or retained by a lawyer, law office, corporation, governmental agency or other entity who performs specifically delegated substantive legal work for which a lawyer is responsible." *To comport with current usage in the profession, these guidelines use the term "paralegal" rather than "legal assistant;" however, lawyers should be aware that the terms legal assistant and paralegals are often used interchangeably.*[276]

The ABA Model Guidelines further explain that "the titles assigned to paralegals must be indicative of their status as nonlawyers and not imply that they are lawyers. *The most common titles are 'paralegal' and 'legal assistant' . . . .*"[277]

In a seminal decision on the meaning of "reasonable attorney's fees," the United States Supreme Court held in *Missouri v. Jenkins by Agyei* that "[c]learly, a 'reasonable attorney's fee' . . . cannot have been meant to compensate only work performed personally by members of the bar," but also includes the work of paralegals, "law clerks," and "recent law graduates" at market rates for their services.[278]  Specifically addressing the issue of paralegal time, the Court held that "if the prevailing practice in a given community were to bill paralegal time separately at market rates, fees awarded the attorney at market rates for attorney time would not be fully compensatory if the court refused to compensate hours billed by

---

[276] ABA Model Guidelines for the Utilization of Paralegal Serv. at 1 n.1 (emphasis added).

[277] *Id.* at 10-11 (emphasis added).  The ABA Model Guidelines also frequently cite to the "National Association of Legal Assistant's Model Standards and Guidelines for the Utilization of Legal Assistants."  *See id.* at 5-7, 14, 17, 18.

[278] 491 U.S. 274, 285, 289 (1989).

paralegals or did so only at 'cost.'"[279]  The Supreme Court thus expressly rejected "the argument that compensation for paralegals at rates above 'cost' would yield a 'windfall' for the prevailing attorney."[280]

In accord with the ABA Model Guidelines—which also provides that "[a] lawyer may charge 'market rates' for paralegal services, rather than actual costs"[281]—Delaware courts have used the terms "legal assistant" and "paralegal" synonymously and permitted payment for their time.  In *Ciappa Construction, Inc. v. Innovative Property Resources, LLC*, the Superior Court held that "Delaware courts have routinely included fees charged for a *legal assistant's time* when granting attorney's fees."[282]  For support, the Superior Court cited to other Delaware cases, including two decisions of the Court of Chancery that applied the practice of this court to compensate paralegals and legal assistants based on their hourly rates.[283]

---

[279] *Id.* at 287.

[280] *Id.*

[281] ABA Model Guidelines for the Utilization of Paralegal Serv. at 17.

[282] 2007 WL 1705632, at *1 (Del. Super. June 12, 2007) (emphasis added); *see also McMackin v. McMackin*, 651 A.2d 778, 779 (Del. Fam. Ct. 1993) ("The phrase 'all or part of the costs of the other party of maintaining or defending' has previously been found broad enough to include fees incurred *by a legal assistant or paralegal.*" (emphasis added)); *In re Dendreon Corp., et al.*, Case No. 14-12515-PJW, Dkt. 72 (Bankr. D. Del. Nov. 12, 2014), *application granted*, Dkt. 152 (Dec. 9, 2014) (granting application authorizing employment and retention of Skadden, including rates of "$195 to $340 for legal assistants").

[283] *See In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 364 & n.6 (Del. Ch. 1999), *aff'd sub nom. First Interstate Bancorp v. Williamson*, 756 A.2d 388 (Del. 2000); *In re Diamond Shamrock Corp.*, 1989 WL 17424, at *1, *3 (Del. Ch. Feb. 23, 1989).

Given these authorities, and the lack of any persuasive Delaware authority to the contrary cited in Paige's reports,[284] the court declines to exclude the entries from Skadden's billing records attributable to legal assistants, legal assistant specialists, client specialists, and law clerks. Each of these entries, which connote the provision of professional services,[285] are properly subject to reimbursement and indemnification at their hourly rates.

### b. Out-of-Pocket Expenses

This court's orders provide that the Custodian's counsel's "reasonable fees and *expenses* . . . shall be paid promptly by TPG."[286] Pursuant to these orders, the

---

[284] Paige cites *Baker v. Baker*, 1990 WL 320333 (Del. Fam. Ct. July 6, 1990) for the assertion that "paralegals and law clerks are part of the attorney's overhead and should not be reimbursed." Dkt. 1429 Ex. B at 20. That case is an outlier. Indeed, it specifically acknowledged "[t]here is a difference among the Judges of the Delaware Family Court as to whether fees of paralegals and law clerks are allowable or should be considered part of the attorney's overhead and reflected in the attorney's hourly fee." *Baker*, 1990 WL 320333, at *11. Indeed, three years later, in a well-reasoned decision applying the rationale of the Supreme Court's decision in *Jenkins by Agyei*, the Family Court held that "[p]aralegal fees are *not* a part of the overall overhead of a law firm" and that "these *legal assistants* have the potential for greatly *decreasing* litigation expenses and, for that matter, greatly increasing the efficiency of many attorneys." *McMackin*, 651 A.2d at 779 (emphasis added).

[285] In his answering brief, the Custodian asserts that "Skadden did not bill for clerical or administrative tasks." Dkt. 1441 at 31 n.9. Respondents separately object to what Paige defines as "Administrative and/or Clerical Tasks." Dkt. 1571 Ex. A at 14-15; *see also* Dkt. 1429 Ex. B at 5. This objection is addressed below.

[286] Dkt. 607 ¶ 11 (emphasis added); *see also* Dkt. 848 ¶ 14.

74

Custodian seeks reimbursement for $215,674—less than 6% of the amount at issue—for the following out-of-pocket expenses:[287]

| | Disbursement Type | Amount |
|---|---|---|
| 1 | Westlaw/Lexis Research | $176,306 |
| 2 | Copying, Reproduction, and Word Processing | $17,751 |
| 3 | Outside Research, eDiscovery, and Certain Court Expenses | $16,526 |
| 4 | Travel and Out-of-Town Meals | $3,794 |
| 5 | Miscellaneous[288] | $1,297 |
| | **TOTAL** | $215,674 |

Relying on Paige's analysis, Respondents object to $194,980—or more than 90% of these expenses.[289] It appears that Paige does not object to the expenses within the third[290] and fourth[291] categories, but does take issue with nearly every dollar in the other categories.[292] To support such an expansive reduction in expenses, Respondents and Paige cite to numerous cases applying Court of Chancery Rule

---

[287] *See* Dkt. 1441 App. A; Dkt. 1537 Ex. A; Dkt. 1555 Ex. A.

[288] This includes expenses such as "Attorney work meals," "Overtime Meals," "Messengers/Courier," and "Vendor Hosted Teleconferencing." *See* Dkt. 1441 App. A; Dkt. 1537 Ex. A; Dkt. 1555 Ex. A.

[289] *See* Dkt. 1429 Ex. B at 6; Dkt. 1571 Ex. A at 6; Dkt. 1573 Ex A.

[290] This category includes expenses that Skadden describes as "Outside Research," "Outside Discovery Services," "Filing/Court Fees," and "Court Reporting." *See* Dkt. 1441 App. A; Dkt. 1537 Ex. A; Dkt. 1555 Ex. A.

[291] This category includes expenses that Skadden describes as "Air/Rail Travel (external)," "Out-of-Town Travel," and "Out-of-Town Meals." *See* Dkt. 1441 App. A; Dkt. 1537 Ex. A; Dkt. 1555 Ex. A.

[292] *See* Dkt. 1429 Ex. B at Ex. 1; Dkt. 1571 Ex. A at Ex. 2; Dkt. 1573 Ex. A.

75

54(d)[293]—which provides that "*costs* shall be allowed as of course to the prevailing party unless the Court otherwise directs."[294]

This court has recognized that "[t]he term 'costs' as employed by Court of Chancery Rule 54(d) is not synonymous with 'expenses' incurred by a party in successfully pursuing his claims."[295] To the contrary, the term "expenses," as used in this court's orders, "has a legally recognized broader definition" than "costs."[296]

Turning to the proper scope of the term "expenses," Comment 1 under Rule 1.5 of the Delaware Lawyers' Rules of Professional Conduct provides that "[a] lawyer may seek reimbursement for the cost of services performed in-house, such as copying, or for other expenses incurred in-house, such as telephone charges . . . by charging an amount that reasonably reflects the cost incurred by the lawyer."[297] The ABA Committee on Ethics and Professional Responsibility similarly provides in a formal opinion that "it seems clear that lawyers may pass on reasonable charges for"

---

[293] *See* Dkt. 1571 at 48 (citing *Tanyous v. Happy Child World, Inc.*, 2008 WL 5424009, at *1 (Del. Ch. Dec. 19, 2008)); Dkt. 1429 Ex. B at 22-23.

[294] Ch. Ct. R. 54(d) (emphasis added).

[295] *Tanyous*, 2008 WL 5424009, at *1.

[296] *Ivize of Milwaukee v. Compex Litig. Support*, 2009 WL 1930178, at *1 (Del. Ch. June 24, 2009)

[297] Del. Lawyers' R. Prof'l Conduct 1.5 Cmt. 1.

in-house services, such as "photocopying, computer research, on-site meals, deliveries and other similar items."[298]

In *Lillis v. AT & T Corp.*, Vice Chancellor Lamb ruled that certain expenses, including "Westlaw charges [that] were incurred in performing the research assigned by [an] associate" were properly subject to reimbursement where a contractual provision "entitle[d] a party to recover attorneys' fees and expenses from an adversary party."[299] Our Superior Court similarly concluded that a contract requiring a party "pay all costs and expenses (including attorneys' fees and disbursements)" of the other party was broad enough to include expenses such as "the cost of photocopying; travel costs; mail and courier expenses; the cost of automated research; [and] manual research expenses" and found the amount billed

---

[298] ABA Formal Op. 93-379 § C (Dec. 6, 1993).

[299] 2009 WL 663946, at *2, *6 (Del. Ch. Feb. 25, 2009); *see also Blank Rome, LLP v. Vendel*, 2003 WL 21801179, at *9 (Del. Ch. Aug. 5, 2003) (upholding arbitrator's decision to permit reimbursement for certain expenses under a fee agreement, including expenses "for photocopies, telephone calls, and computer research" and noting that "[c]ommon sense suggests that when a client hires a lawyer, the client implicitly agrees that the lawyer will have certain resources to accomplish the task at hand. The client cannot require the lawyer to give diligent representation and at the same time handcuff the lawyer from having access to the customary tools of the profession (*e.g.* photocopies, telephone calls and legal research) and techniques (*e.g.* summarizing the relevant portions of lengthy depositions)").

for those expenses was reasonable.[300]  Based on this precedent, I find Respondents and Paige's reliance on Court of Chancery Rule 54(d) unpersuasive.

Based on an independent review of these expenses, the court finds they are reasonable as a general matter.  A substantial portion of the expenses sought (over 86%) stem from Westlaw, Lexis/Nexis, and "Outside Research" charges.[301]  These research-related expenses are reasonable in light of the numerous legal issues Respondents created across multiple jurisdictions during the relevant time period.[302]  Respondents' objection is overruled.

### 3.    Objectionable Billing Practices

In their final and most granular general objection, Respondents seek a reduction of $429,335 based on what Paige characterizes as "Generally Objectionable Billing Practices."[303]  In his reports, Paige used a "Tagging Guide" to track instances of allegedly "Generally Objectionable Billing Practices" using seventeen different "tags."[304]  To be more specific, attached to Paige's reports are

---

[300] *Salaman v. Nat'l Media Corp.*, 1994 WL 465535, at *4 (Del. Super. Ct. July 22, 1994).

[301] "Outside Research" accounts for $9,718.30 of the expenses sought and includes expenses related to File & ServXpress LLC and Pacer Service Center.  *See* Dkt. 1441 App. A; Dkt. 1537 Ex. A; Dkt. 1555 Ex. A.

[302] The court addresses one specific Westlaw charge in Part V.B.9, *infra*.

[303] Dkt. 1429 Ex. B at 19; Dkt. 1571 Ex. A at 6, 21; Dkt. 1573 Ex. A.

[304] *See* Dkt. 1429 Ex. B at Ex. 4; Dkt. 1571 Ex. A at Ex. 4.

copies of Skadden's billing records where he has applied directly to the billing record "tags" using a numbering system to virtually every attorney time entry.

The tags are not mutually exclusive. A single time entry may have more than one tag. Indeed, to my eye, most of the entries included multiple tags for allegedly objectionable billing practices.[305] For example, time entries tagged for "block billing" frequently were also tagged as "vague."

Two of the seventeen tags—for "inappropriate timekeepers" and "non-billable disbursements" (Tags #7 and #12)—have been addressed in Part V.A.2 above. Two of the other tags—for "update letters" and "motion for certification" (Tags #16 and #17)—overlap with the subject matter specific objections addressed in Part V.B. below. The court considers the remaining thirteen tags next.

### a. Block Billing (Tag #1)

Respondents argue that "Skadden's practice of block billing contaminated" thousands of hours of work and "block this Court, Objectors, or an expert's ability to analyze the reasonableness of the claimed fees."[306] Paige opines that "[l]egal authorities and other generally accepted commercial standards . . . discuss why the

---

[305] For entries with multiple tags, the entire dollar amount is attributed to each tag in Paige's "Objection Totals." Dkt. 1429 Ex. B at Ex. 3; Dkt. 1571 Ex. A at Ex. 3; Dkt. 1573 Ex. A. As a result, the sum of the "Total Amount of Objection" figures in Paige's first report ($390,576) is significantly more than the amount at issue for that period ($242,886). Dkt. 1429 Ex. B at Ex. 3.

[306] Dkt. 1571 at 42, 49-50.

use of block billing is not a reasonable billing practice."[307] This objection is overruled.

Respondents cite no case where a Delaware court has ruled that block billing is impermissible as a matter of law. In fact, Delaware courts have noted the absence of "any Delaware case that finds block-billing objectionable *per se*."[308] The relevant inquiry is whether the use of block billing "make[s] it more difficult for a court to assess the reasonableness of the hours claimed."[309]

Having reviewed a large number of the "block billing" time entries that Paige "tagged," the court is satisfied that the level of description provided has not impeded its ability to assess the reasonableness of Skadden's fees. The entries typically explained both the type of work performed (*e.g.*, legal research, analysis, motion or brief drafting, etc.) along with the "case-related event to which this work specifically related."[310] Indeed, my review of tagged entries—many of which appeared on

---

[307] Dkt. 1571 Ex. A at 17. For support, Paige refers to the appendix to his "First Report." *Id.* That appendix cites three cases, none of which support his opinion that "block billing is not a reasonable billing practice" as a matter of law. *See* Dkt. 1429 Ex. B at 25-26.

[308] *Concord Steel, Inc. v. Wilm. Steel Processing Co., Inc.*, 2010 WL 571934, at *3 n.22 (Del. Ch. Feb. 5, 2010), *aff'd*, 7 A.3d 486 (Del. 2010) (TABLE); *see also Immedient Corp. v. HealthTrio, Inc.*, 2007 WL 656901, at *4 (Del. Super. Ct. Mar. 5, 2007) (noting that "block billing is not prohibited *per se*").

[309] *Immedient*, 2007 WL 656901, at *4.

[310] *Morris v. Astrue*, 2013 WL 257108, at *4-5 (D. Del. Jan. 23, 2013) (declining to reduce fees that were "collected together in large blocks of time" because "[t]he tasks grouped together here (such as legal research, brief writing, and record review) are frequently

80

copies of billing records Skadden color-coded by subject matter[311]—confirm my confidence in Skadden's categorization of the entries so as to allow me to assess the reasonableness of the fees charged for particular tasks.

### b. Vague Entries (Tag #2)

Respondents argue that certain time entries "are extraordinarily vague, preventing Objectors from considering the reasonableness of the work actually performed."[312] This objection is overruled.

Based on the same review of time entries discussed above, the court observes that the time entries almost uniformly include a brief description of the work or task performed and the subject matter at issue. The court is satisfied that the time entries provide Respondents and the court with sufficient detail to assess the reasonableness of the charges.[313]

---

completed in conjunction with one another, often in a manner that can make specific time allocations for each difficult to cull out").

[311] *See* Dkt. 1571 Ex. A.

[312] Dkt. 1571 at 21.

[313] It appears Paige was over-inclusive in deciding which entries to "tag" as vague. For example, Paige tagged an entry of 0.20 hour with the description "confer with B. Pincus re: Cypress subpoena and follow up re: subpoena." *See* Dkt. 1429 Ex. B. It is not clear what about this entry is too vague, especially given the twelve minutes it covers.

### c.  Quarter Hour Billing (Tag #3)

Paige opines that "[q]uarter, half and full hour billing is disallowed."[314] Indicative of the caviling mentality of Paige's assignment, this criticism applies to three entries that add up to 1.75 hours of a partner's time.[315]  This objection is overruled.  Paige provides no support for the proposition that billing in quarter hour increments is improper under Delaware law or that the miniscule number of entries involved resulted in inflated billing hours.

### d.  Clerical/Administrative Tasks (Tag #4)

Paige tagged 31 entries "for clerical and/or administrative tasks, requiring no clear professional-level skill."[316]  This objection is sustained in part.

The United States Supreme Court held in *Jenkins by Agyei* that "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them."[317]  Delaware courts are in accord.[318]  Importantly, the 31 entries at issue—which add up to $84,014—included all the time within the entry as clerical

---

[314] Dkt. 1429 Ex. B at Ex. 4; Dkt. 1571 Ex. A at Ex. 4.

[315] *See* Dkt. 1571 Ex. A.

[316] Dkt. 1571 Ex. A at 5, 14; *see also* Dkt. 1429 Ex. B at 5.

[317] 491 U.S. at 288 n.10.

[318] *Lillis*, 2009 WL 663946, at *3 ("First, secretarial services (like other overhead) are normally included in a law firm's hourly rates."); *Lamourine v. Mazda Motor of Am., Inc.*, 2008 WL 8058954, at *2 (Del. Super. Ct. Dec. 29, 2008) ("Additionally, as to the reasonableness of fees, Defendants argue that it is unreasonable for Plaintiffs' counsel to bill his hourly rate for administrative or clerical tasks. The Court agrees.").

or administrative, even when the entry included other tasks properly subject to reimbursement for professional services.[319] Based on my independent review of each of the 31 time entries, the court concludes that the fees in question should be reduced by 20% or $16,803 because it is reasonably inferable from the face of the entries that only a small portion of the services performed involved work that appears to have been administrative in nature.[320]

### e. Excessive Staffing (Tag #5)

Respondents contend the Custodian and Skadden's fees stem from "massive overstaffing"[321] and reference "overstaffing" twenty-three times in their objections.[322] In contrast to Respondents' hyperbole, Paige tagged as "Excessive Staffing" only ten entries totaling 15.3 hours.[323] Four of these entries, totaling 7.6 hours, focus on a single day, October 21, 2019, during which the court provided a

---

[319] As an example, Paige tagged as administrative an entry of 2.3 hours with the description "review and edit, finalize and *supervise filing* of opposition to Rule 42 motion; review authority cited therein and respondents' application." Dkt. 1571 Ex. A at 15 (emphasis added). The part of this entry about "supervise filing" is administrative work but the remaining work reflects professional services.

[320] Twenty percent is the deduction Paige applied to all of the allegedly "Generally Objectionable Billing Practices." *See* Dkt. 1429 at 6, 19; Dkt. 1571 Ex. A at 6, 21, 25; Dkt. 1573 Ex. A.

[321] Dkt. 1571 at 3.

[322] Dkt. 1429 at 4, 16, 40, 43, 44; Dkt. 1451 at 22; Dkt. 1571 at 3, 25, 26, 30, 37, 54, 55, 59; Dkt. 1573 at 2; Dkt. 1585 at 5, 10; Dkt. 1588 at 2, 10 n.7, 16, 25, 27, 33.

[323] Dkt. 1573 Ex. A.

telephonic ruling relating to the Custodian's motion for civil contempt.[324] The time entries in question on that day reference preparing for and attending the hearing, analysis of the court's decision, work on a proposed order, and discussion with the client, *i.e.*, the Custodian. This objection is overruled.

The October 21, 2019 hearing was not a minor matter. Two partners and two associates from Skadden attended. At least four lawyers for Respondents attended as well, including Alan Dershowitz.[325] It was not unreasonable for either side to have four lawyers attend this hearing. Those four entries also reflect other work the lawyers performed relating to the subject of the hearing apart from attending the hearing itself. Paige's other tags for "Excessive Staffing" are similarly without merit.[326]

### f.     Long Days (Tag #6)

Paige tagged any entries where a timekeeper billed more than ten hours in a day.[327] This objection is overruled. Paige provides no legal support for the

---

[324] *See* Dkt. 1408.

[325] *See id.*

[326] The other six entries Paige objects to under this tag relate to a conference call between six Skadden attorneys regarding "responses to TPG/Shawe's opposition to fee petition and opposition to proposed discharge order." Dkt. 1573 Ex. A. The call appears to have lasted approximately one hour. *See id.* A one-hour teleconference regarding Respondents' extensive objections on a matter as important as the Custodian's discharge does not strike the court as unreasonable.

[327] Dkt. 1429 Ex. B at Ex. 4 ("Rule: A 'long day' is defined as more than 10 hours billed in a day."); Dkt. 1571 Ex. A at Ex. 4 (same).

proposition that billing more than ten hours in a day is improper or unreasonable. As much as attorneys (or their families) may wish it were otherwise, working more than ten hours in a day is part of life when practicing in this court, particularly in expedited matters. Attorneys are entitled to be compensated for all their work in a given day and not just an arbitrary portion of it.

### g. Travel (Tag #8)

Paige tagged two billing entries for a total of 12.9 hours on the assumption they were "purely for travel only," meaning "there is no substantive work being performed."[328] This objection is overruled.

This court has held "[i]t is common practice to bill for 'dead' travel time where, for whatever reason, the attorney was unable to perform other work during that time."[329] Apart from that, the two entries in question—which concern one attorney traveling to and from Nevada for a hearing on an emergency motion to stay that TPG declined to postpone despite the pending motion for contempt in this court[330]—reflect that substantive work also was performed.[331]

---

[328] Dkt. 1429 Ex. B at Ex. 4.

[329] *Lillis*, 2009 WL 663946, at *6.

[330] *See TransPerfect*, 2019 WL 5260362, at *9, *13.

[331] *See* Dkt. 1537 Ex. A (time entry with description "travel from Nevada in connection with TPG hearing; attention to ruling by Chancellor Bouchard; confer with Custodian; attention to/edit letter to Nevada court").

### h.  Pattern Entries (Tag #9)

Respondents argue that Skadden's fee petitions should be reduced for "numerous vague, pattern entries, such as 'researching case law regarding appeals'; 'research re appeals' and 'research' for interlocutory appeal brief."[332] This objection is overruled.

As with block billing, there is nothing inherently unreasonable about an attorney having multiple billing entries with similar or identical language. Indeed, the entries Paige highlights in his reports indicate that these "pattern entries" reflect substantive work that simply occurred over more than one day, such as drafting and legal research.[333] Using the same words to describe the same task that is performed over more than one day is not unreasonable.

### i.  Legal Research (Tag #10)

Respondents assert that Skadden engaged in "excessive legal research" because "the issues that arose during this billing time period were not at all complex."[334] Paige opines that "a firm such as Skadden should be presumed to have a firm grasp on such issues without the devotion of such a massive amount of time"

---

[332] Dkt. 1429 at 43.

[333] *See* Dkt. 1571 Ex. A at 18-19.

[334] Dkt. 1571 at 26, 46.

and that "such large amounts of research should not be needed for a firm of this stature to understand the law."[335]  This objection is overruled.

Law firms—even those as large as Skadden—are not expected to have encyclopedic knowledge of every legal issue they confront in an engagement.  More to the point, careful preparation through legal research is an expected and fundamental element of virtually any legal representation to understand the nuances of legal issues as they arise in various contexts.[336]  Paige's report proves the point. He focuses on nine entries by two timekeepers totaling 57.3 who conducted research "re judicial immunity and privilege in connection with subpoenas."[337]  Putting aside that the entries show that the work also included the preparation of a memo, the subject matter—judicial immunity—is hardly an everyday issue.  As this court

---

[335] Dkt. 1571 Ex. A at 21.  In his "Tagging Guide," Paige states that he would only apply this tag "if legal research is more than 3 hours in a [day] for single [sic] issue for an individual timekeeper and no approval is indicated."  Dkt. 1429 Ex. B at Ex. 4; Dkt. 1571 Ex. A at Ex. 4.  Paige's reports, however, use two "tags" under this objection, one described as "Legal Research," and the other described as "Legal Research [Hours over 3]."  Dkt. 1429 Ex. B at Ex. 3 (brackets in original); Dkt. 1571 Ex. A at Ex. 3 (same); Dkt. 1573 Ex. A (same).  Paige does not explain why he uses two numbers under this objection or how both numbers comport with his "rule."  In any event, the implication in Paige's reports that a research session exceeding three hours is "excessive" is arbitrary and unsubstantiated.

[336] *See* Del. Lawyers' R. Prof'l Conduct 1.1 Cmt. 1 ("In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include . . . the preparation and study the lawyer is able to give the matter . . . ."); *Clark v. State Farm Ins. Co.*, 1990 WL 139382, at *3 (E.D. Pa. Sept. 20, 1990) (Sanctioning attorney "for his failure to conduct a normally competent level of legal research"); *Bonilla v. State*, 62 So. 3d 1233, 1234 n.1 (Fla. Dist. Ct. App. 2011) ("Competent legal research is the responsibility of counsel.").

[337] Dkt. 1571 Ex. A at 20-21.

explained in a custodianship case in 2013, the "scope of [judicial immunity] has not yet been defined in Delaware."[338] It is not unreasonable that an appreciable amount of time was devoted to this task.

### j.      Training/Supervision (Tag #11)

Paige tagged five entries for "Training/Supervision." Paige's "Tagging Guide" asserts the rule for this classification as follows: "The charge must clearly show that the client is being charged for training. It should not just be somehow 'implied.'"[339] Based on the court's review of each of the five entries in question, the court is not satisfied that any of the entries clearly show that the time incurred was for training.[340] This objection is overruled.

### k.      Overqualified (Tag #12)

Respondents contend that Skadden "inappropriately utilized overqualified attorneys."[341] They further explain: "For example, attorneys billing at rates of around $1,000/hour spent extensive time on numerous . . . entries, such as 'Research Re and Draft Motion for Contempt', [sic] 'Draft Riders for Reply for Motion for

---

[338] *Jepsco, Ltd. v. B.F. Rich Co., Inc.*, 2013 WL 593664, at *6 (Del. Ch. Feb. 14, 2013).

[339] Dkt. 1429 Ex. B at Ex. 4; Dkt. 1571 Ex. A at Ex. 4 (same).

[340] Paige presumably classified some of the entries as such because they included words like "coordinate" and "supervise" within descriptions that, in my view, do not "clearly show" that Skadden was charging for training. *See Lillis*, 2009 WL 663946, at *7 (permitting fees and expenses related to "time spent by a Weil Gotshal associate conferring with a summer associate on a research task").

[341] Dkt. 1571 at 53.

88

Contempt,' 'Research for Motion for Contempt,' and 'Attention to Drafting Motion for Contempt and Sanctions and Related Matters.'"[342] This objection is overruled.

This objection is, in effect, a reprise of Respondents' challenge to Skadden's hourly rates, which the court previously addressed and overruled. As noted above, Skadden's lead litigation partner for this engagement submitted an affidavit under penalty of perjury attesting that the fees "are reasonable for the tasks performed."[343] Respondent's ask the court to second-guess the judgment of more senior attorneys in how to delegate legal tasks, such as researching and drafting, to associate attorneys.[344] Nothing about the entries Respondents have cited warrant the court doing so with respect to what are quintessential legal tasks.

### l. Internal Conferences (Tag #14)

Paige takes issue with 205 entries that include a reference to "internal conferences,"[345] which he opines "suggest[s] that the Action continues to be conducted without efficiency."[346] This objection is overruled.

---

[342] *Id.* at 53-54.

[343] Dkt. 1593 ¶ 6.

[344] *See Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *13 (Del. Ch. Feb. 13, 2018) (declining to second guess questions about staffing and hours based on sworn affidavit of a senior partner attesting to the reasonableness of the fees and expenses sought).

[345] Dkt. 1429 Ex. B at Ex. 3; Dkt. 1571 Ex. A at Ex. 3; Dkt. 1573 Ex. A.

[346] Dkt. 1571 Ex. A at 19; *see also* Dkt. 1429 Ex. B at 16-17. As Paige admits, however, this figure is inflated because he did not attempt "to separate the conferencing time from other time within the same block." Dkt. 1429 Ex. B at 5 n.3; Dkt. 1571 Ex. A at 6 n.6.

Notably, four of the ten entries discussed in the body of Paige's reports cannot fairly be characterized as "internal" conferences. Three of them concern conferences with the client, *i.e.*, the Custodian, and a fourth is a teleconference with Nevada counsel.[347] In any event, as detailed above, the Custodian was tasked with responding to and defending against multiple litigations, appeals, and motions in multiple jurisdictions during the period at issue. It is eminently reasonable that Skadden attorneys would need to communicate with each other to coordinate strategy and assignments in an "all fronts" assault instigated by Shawe.[348] Once again, nothing in the entries Paige has identified warrants the court second-guessing how this was done when Skadden's lead litigation partner has attested that the fees "are reasonable for the tasks performed."[349]

---

Thus, for example, this figure includes the entire 1.33 hours in a time entry with the description "review revised opposition; emails and TCS with Timekeeper A – re sanctions." Dkt. 1571 Ex. A at 19.

[347] *See* Dkt. 1429 Ex. B at 16-17; Dkt. 1571 Ex. A at 19.

[348] The cases on which Respondents rely are inapposite. *See Gillberg v. Shea*, 1996 WL 406682, at *5 (S.D.N.Y. May 31, 1996) (finding that a case involving "simple factual and legal issues" and only $100,000 in controversy did "not justify so large a 'team'" of "five lawyers (and a paralegal)"); *Immedient*, 2007 WL 656901, at *4 (reducing fee award by 20% where "the fact that *forty* individuals, *the vast majority being attorneys*, billed to this case strikes the Court as unnecessarily high" (emphasis added)).

[349] Dkt. 1593 ¶ 6.

90

### m.    Redacted Entries (Tag #15)

Paige objects to six time entries totaling less than $5,000 that are partially redacted.[350] This objection is overruled. The redactions at issue are minimal and do not prevent Respondents from understanding the basis for the charges or their reasonableness. Five of the entries merely redact a name. For example, Paige objects to an entry of .25 hours with the description "attention to communications from [redacted] of Credit Suisse."[351]

* * * * *

For the reasons explained above, Respondents' general objections are denied, with the exception of their objection "for clerical and/or administrative tasks," which is sustained in part. The $13,803 reduction for clerical/administrative tasks is reflected on the chart attached as Exhibit A.

### B.    Subject Matter Specific Objections

This section considers Respondents' objections to the Custodian's fee petitions based on the subject matter of the work performed. As depicted in the chart attached as Exhibit A to this opinion, the services Skadden provided fall into eighteen categories. The Custodian has withdrawn his request for reimbursement

---

[350] *See* Dkt. 1429 Ex. B at Ex. 3; Dkt. 1573 Ex. A.

[351] *See* Dkt. 1429 Ex. B at 14 & Ex. 3.

concerning category 10[352] and Respondents do not object to the amounts sought for categories 17 and 18.[353]

In their subject matter objections, Respondents reiterate many of the challenges advanced in Paige's reports concerning, among other things, Skadden's billing rates, block billing and allegedly vague entries, the amount of legal research, and use of "overqualified attorneys." Those issues were addressed in Part V.A. above and will not be repeated here. This section only considers Respondents' other arguments with respect to the subject matter of the services rendered.

### 1. Contempt Fee Award and Fee Order Violations

On October 17, 2019, the court found TPG and Shawe in contempt of court for filing the Nevada Action in violation of the exclusive jurisdiction provision in the Final Order.[354] As a sanction, the court ordered that TPG and Shawe shall pay the Contempt Fee Award, *i.e.*, "all fees and expenses, including reasonable attorneys' fees, incurred by the Custodian and his counsel in (i) connection with the

---

[352] *See* Dkt. 1592 at 5.

[353] Dkt. 1571 at 59 n.31. Category 17 ("other TPG litigations") concerns (i) TPG's legal malpractice claim against RAM and one of its partners and (ii) TPG's lawsuit against this judicial officer, which was filed on December 24, 2020 and dismissed on April 12, 2021. *See supra* Parts I.U-V. Category 18 ("escrow matters") involved the Custodian responding to a request from Elting's counsel concerning distributions from the escrow fund and its current holdings. Dkt. 1576 at 24. The amounts sought for both categories ($5,478 and $3,000, respectively) are reasonable and will be approved, with the $3,000 related to "Escrow Matters" coming out of the Escrow.

[354] *TransPerfect*, 2019 WL 5260362, at *1, *15.

Nevada action and (ii) prosecution of the motion for civil contempt and sanctions in this court, insofar as such prosecution concerns TPG's and Shawe's contempt of the Final Order."[355] The October 17 opinion reserved decision on "the motion for contempt insofar as it concerns the Fee Orders."[356]

On October 21, 2019, the court found that TPG also violated the two Fee Orders by failing to pay the amounts due thereunder.[357] In the exercise of its discretion, however, the court did not hold Respondents in contempt for those violations, "because of some practical concerns . . . at this stage of the case about the fee petition process, particularly with respect to the lack of precision concerning the deadlines for filing objections and making payments."[358]

The Custodian now seeks a total of $1,573,418 of fees and expenses that he and his counsel incurred with respect to the contempt motion and the Nevada Action, divided as follows: (i) $1,148,291 as a *sanction* pursuant to the Contempt Fee Award and (ii) $425,127 pursuant to the reimbursement and indemnification provisions in this court's orders with respect to the Fee Orders.[359] The Custodian

---

[355] Dkt. 1399 ¶ 7.

[356] *TransPerfect*, 2019 WL 5260362, at *1.

[357] Hr'g Tr. at 6-8 (Oct. 21, 2019) (Dkt. 1408).

[358] *Id.* at 8-9.

[359] *See* Dkt. 1576 at 17, 19.

summarizes the work he and his counsel performed with respect to the Contempt

Fee Award as follows:

> After analyzing the original Nevada complaint and retaining Nevada counsel, Pincus filed the motion for contempt in this Court and an opening brief in support. Pincus's counsel then participated in a scheduling conference. Immediately after the Court entered a schedule on the contempt motion, Objectors filed an amended complaint in the Nevada action, raising entirely new arguments and necessitating further analysis from the Custodian and his counsel.

> Pincus and his counsel responded to two separate oppositions to the contempt motion, addressed a specious request for an adjournment of the contempt hearing, and prepared for the hearing, which the Court had indicated would "primar[ily] focus" on Objectors' violation of the Final Order.

> Three days before the contempt hearing, Objectors moved for partial summary judgment in the Nevada proceeding and then refused a straightforward stay of that action while the contempt motion was being decided. Thus, Pincus and his counsel prepared an expedited motion to stay the Nevada litigation. They also prepared a motion to dismiss the amended complaint and an opposition to Objectors' motion for partial summary judgment, which were both due within a week of the contempt hearing. Pincus's counsel then attended an in-person hearing in Las Vegas on the motion to stay.[360]

As to the Fee Orders, the Custodian describes the work he and his counsel

performed as follows:

> The fees were incurred in seeking to enforce the Court's Fee Orders, including efforts to seek payment from TPG in accordance with the Fee Orders, analyzing the Custodian's right to payment under Court orders and agreements, drafting a motion for contempt and researching issues related to TPG's failure to pay, analyzing two motions to compel Pincus

---

[360] Dkt. 1576 at 17-18 (internal citations and footnote omitted).

to provide billing records, participating in a meet and confer with Objectors regarding that motion, analyzing and responding to discovery requests Objectors served related to Pincus's fee petitions, responding to two oppositions to the motion for contempt, including addressing issues of constitutional law and negotiating a proposed order implementing the Court's ruling on the fee dispute.[361]

Respondents make essentially three arguments in opposition to paying the Contempt Fee Award and reimbursing the Custodian with respect to the Fee Orders. None have merit.

First, Respondents object to the Custodian's allocation of fees between the work relating to the Contempt Fee Award (74%) and the Fee Orders (26%), contending that "the fees should be near equal for the two parts."[362] The court disagrees. Backing out $370,029 that was expended to defend against the Nevada Action,[363] which is only relevant to the violation of the Final Order, the allocation between (i) the balance of the amount sought for the Contempt Fee Award ($778,262) and (ii) the amount sought for work relating to the Fee Orders ($425,127) is approximately 65% to 35%, respectively. This allocation is appropriate in my view given, as the court explained when scheduling the contempt hearing, the

---

[361] *Id.* at 19.

[362] Dkt. 1571 at 18.

[363] Dkt. 1576 at 42 n.19.

"primary focus" of the "hearing [was] whether or not there ought to be an anti-suit injunction" based on TPG and Shawe's violation of the Final Order.[364]

Second, Respondents argue that none of the $425,127 the Custodian seeks related to the Fee Orders is subject to reimbursement because "the Court explicitly held that Skadden could not recover its fees for the unsuccessful effort to hold TPG and Shawe in contempt concerning the Fee Orders."[365] More specifically, TPG and Shawe assert that the "Second Order . . . expressly requiring allocation of fees between the two parts of the contempt motion . . . was required precisely and only because the Fee Orders fees are not recoverable."[366]

This argument misconstrues the plain meaning of the court's contempt rulings and implementing orders. Read correctly, allocation was required because the Contempt Fee Award was ordered as a *sanction* for intentional misconduct while, as expressly addressed in the Second Order, the Custodian maintained the right to seek *reimbursement under prior court orders* for fees and expenses incurred with respect to other subject matters.

In its October 17, 2019 memorandum opinion finding TPG and Shawe in contempt of the Final Order, the court explained it would order them to pay the

___

[364] Hr'g Tr. at 27 (Sept. 13, 2019) (Dkt. 1375).

[365] Dkt. 1571 at 14.

[366] *Id.* at 15.

Custodian's attorneys' fees and expenses as a *sanction* because of their contempt without regard to the Custodian's other rights to recover these fees and expenses, as follows:

> Finally, the court will order that Respondents bear all of the expenses, including reasonable attorneys' fees, that the Custodian has incurred because of the Respondents' contempt. This *sanction* includes all the expenses the Custodian and his counsel have incurred in defending the Nevada action and in connection with the prosecution of the contempt motion. Awarding this *sanction* is particularly appropriate given the intentional and willful nature of the contempt violation, including Respondents' insistence on pressing its prosecution of the Nevada action in the face of the contempt proceedings. *The court will award the payment of these expenses as a sanction, without regard to whatever rights the Custodian has to recover these amounts under this court's orders and/or the Sale Agreement.*[367]

Paragraph 4 of the First Order, which implemented the court's October 17 ruling, reflected the sanction award.[368]

In its October 21, 2019 transcript ruling, the court denied the Custodian's motion for contempt as to the Fee Orders "in the exercise of [its] discretion," and explained that "paragraph 4(ii)" of the First Order—which concerned the fee *sanction* the court awarded—thus would need to be modified to "not award fees and expenses incurred with respect to the prosecution of the contempt motion insofar as the fee orders are concerned."[369]  As the court's reference to paragraph 4 of the First

---

[367] *TransPerfect*, 2019 WL 5260362, at *15 (emphasis added) (footnote omitted).

[368] *See* Dkt. 1379.

[369] Hr'g Tr. at 5, 14 (Oct. 21, 2019) (Dkt. 1408).

Order makes clear, the modification the court planned to make in the implementing order for the October 21 ruling solely concerned the *sanction* the court had imposed against TPG and Shawe for their contempt of court. It had nothing to do with altering any of the Custodian's pre-existing rights; nor was that issue even before the court.

On November 1, 2019, the court entered the Second Order implementing its October 21 ruling.[370] Consistent with the court's denial of contempt with respect to the Fee Orders on October 21, the Second Order modified paragraph 4 of the First Order imposing a sanction for prosecuting the contempt motion to limit the sanction to the prosecution of the Final Order, as follows:

> Paragraph 4 of the First Order is hereby modified to incorporate the text underlined below:

> Respondents shall pay all fees and expenses, including reasonable attorneys' fees, incurred by the Custodian and his counsel in (i) connection with the Nevada action and (ii) prosecution of the motion for civil contempt and sanctions in this court, insofar as such prosecution concerns TPG's and Shawe's contempt of the Final Order.[371]

The court also included in paragraph 3(e) of the Second Order a fee-shifting provision to apply if any party acted in bad faith in the fee petition process.[372] The second sentence of paragraph 3(e) expressly preserved all of the Custodian's rights

---

[370] *See* Dkt. 1399.

[371] Dkt. 1399 ¶ 7.

[372] *Id.* ¶ 3(e).

to recover fees and expenses under prior court orders or any other form of pre-existing protection: "For the avoidance of doubt, any [order finding that a party acted in bad faith] shall be in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement."[373]

In sum, for the reasons just explained, nothing in this court's October 17 memorandum opinion, its October 21 transcript ruling, or the orders implementing those rulings fairly can be read to have precluded the Custodian from seeking reimbursement for reasonable fees and expenses or to be indemnified to the fullest extent permitted by law under prior orders of the court with respect to the Fee Orders.[374]

Third, Respondents contend that "[t]he fees charged for the Nevada Litigation and the Contempt Motion concerning the Final Order are disproportionate to the reasonable and necessary work performed by Skadden " and "must be significantly reduced by at least 56%."[375] The 56% reduction equates to the net reduction

---

[373] *Id.*

[374] The Custodian expressly reserved his "rights to petition for fees and expenses that I have incurred . . . separate and apart from pursuing" contempt and sanctions against TPG and Shawe. Dkt. 1334 Ex. 1 at 14; Dkt. 1358 Ex. 1 at 4.

[375] Dkt. 1571 at 50, 56.

proposed by Paige in his report filed with the Second Objection[376] and Respondents' underlying criticisms largely rehash the issues covered in the Paige's reports.[377] Having rejected virtually all of these criticisms for the reasons explained in Part V.A., the court sees no basis for applying any reduction, much less one for 56%.

Notably, Respondents deviate widely from their own expert on one issue. Out of all of Skadden's billing records, Paige tagged ten entries totaling only 15.3 hours as involving "excessive staffing."[378] By contrast, Respondents accuse Skadden of "overstaffing and excessive preparation time" with respect to the contempt motion because of the amount of time they expended over a seven-day period to prepare a 32-page reply brief they belittle as "excessive."[379] This after-the-fact criticism rings hollow. As an initial matter, because of the exigencies, the Custodian only had one week to respond to two briefs—not one as Respondents misleadingly represent[380]— that TPG (23 pages) and Shawe (31 pages) filed separately in opposition to the

---

[376] Dkt. 1571 Ex. A at 7 (recommending that the fees and expenses be reduced by "$1,804,125.74, or 56% from the original fees and expenses requested by the Custodian").

[377] *See* Dkt. 1571 at 50-56 (challenging, among other things, billing practices, hourly rates, use of "overqualified attorneys," and time expended on legal research).

[378] *See supra* Part V.A.3.e; Dkt. 1573 Ex. A. The dollar amount Paige tags for excessive staffing ($18,386) totals approximately 0.5% of the total amount at issue. *See* Dkt. 1429 Ex. B at Ex. 3; Dkt. 1571 Ex. A at Ex. 3; Dkt. 1573 Ex. A.

[379] Dkt. 1571 at 55.

[380] *See id.*

contempt motion, along with an affidavit attacking the Custodian over a range of issues.[381]  In short, the work Skadden did was commensurate to the task at hand.

More broadly, it bears emphasis that the need to file the contempt motion and to proceed expeditiously, which is often less cost efficient, were problems entirely of Respondents' own making.  They chose to disregard this court's payment orders and to sue the Custodian over his fee petitions in Nevada state court, in violation of the exclusive jurisdiction provision in the Final Order.  And, when confronted with the contempt motion, Respondents doubled down.  Instead of staying the Nevada Action to allow the parties to proceed in a more orderly manner, they insisted on pushing ahead in Nevada while trying to delay the contempt proceedings,[382] forcing the Custodian to fight a highly expedited, two-front litigation battle.  Having created the exigency—unnecessarily—to which the Custodian and his counsel were forced to marshal resources and respond quickly, Respondents have no equity in quarreling over fees and expenses they caused to be incurred.[383]

According to the Custodian, "Pincus, 3 partners, 5 associates and 5 legal assistants from Skadden worked on the contempt motion and the Nevada litigation"

---

[381] *See* Dkts. 1359, 1360, 1362.

[382] *See* Dkts. 1369, 1370, 1371, 1372, and 1373.

[383] *Mahani*, 935 A.2d at 248 (noting "that it would be inequitable to deny [a party] the full amount of its attorneys' fees and other expenses since [the opposing party] was responsible for inflating those fees and expenses").

in addition to "1 partner and 2 associates from Pisanelli Bice, Pincus's Nevada counsel, [who] assisted with the Nevada litigation."[384] A smaller team performed the work on the Fee Orders, with 1 partner and 3 associates accounting for 78% of the work.[385]

Having presided over innumerable expedited proceedings, this level of staffing was entirely reasonable under the circumstances. For this reason, and the other reasons discussed above, Respondents' objections over the amount sought for the Contempt Fee Award, as a sanction, and for reimbursement with respect to the Fee Orders are overruled.[386]

### 2.    Appeals

The Custodian seeks reimbursement of $336,128 of attorneys' fees that were incurred in preparing papers he was obligated to file in connection with two applications for interlocutory review and three direct appeals filed by Respondents. More specifically, the Custodian prepared and filed (i) oppositions to two motions for certification of interlocutory appeals,[387] as required under Supreme Court Rule

---

[384] Dkt. 1576 at 18.

[385] *Id.* at 19.

[386] For the reasons discussed in Part V.B.3 below, the court will reduce the amount sought for the Fee Orders by $60,000, which accounts for the work done drafting and implementing the confidentiality restrictions in the Second Order and Records Confidentiality Order. Thus, the amounts allowed are $1,148,291 for the Contempt Fee Award and $365,127 for the Fee Orders.

[387] Dkts. 1404, 1419, 1420.

42; and (ii) three replies to Respondents' responses to Notices to Show Cause issued by the Delaware Supreme Court.[388] Respondents assert two objections.

First, Respondents contend that $122,500 of this amount should be allocated to a different subject matter category, namely the category for "confidentiality motions,"[389] which is addressed in the next section. This objection is overruled. The Custodian's filings did not concern the merits of any confidentiality issue. Rather, the relevant issue in those filings was whether the requirements for taking an interlocutory or direct appeal had been satisfied—they were not. The direct appeals were dismissed because they failed to "fall within the collateral order doctrine"[390] and the interlocutory appeals were refused based on the policy against piecemeal appeals.[391] Thus, there is no basis for the reallocation Respondents seek.

Second, Respondents contend the amount sought should be reduced by "at least 56%" based on the factors considered in Paige's reports.[392] Because the court

---

[388] Notice to Show Cause, *TransPerfect Glob., Inc. v. Pincus*, No. 439, 2019 (Del. Nov. 27, 2019), Dkt. 11; Notice to Show Cause, *TransPerfect Glob., Inc. v. Pincus*, No. 441, 2019 (Del. Nov. 27, 2019), Dkt. 8; Notice to Show Cause, *TransPerfect Glob., Inc. v. Pincus*, No. 501, 2019 (Del. Nov. 27, 2019), Dkt. 2.

[389] Dkt. 1571 at 33.

[390] *TransPerfect*, 2019 WL 7369433, at *2.

[391] Dkt. 1410 ¶¶ 8-10; Dkt. 1425 at 2.

[392] Dkt. 1571 at 57; *see also* Dkt. 1429 at 42-43.

has rejected Paige's analysis, with one exception not relevant here, this objection is overruled.

### 3. Confidentiality Motions

The Custodian seeks $265,592 relating to Respondents' motions challenging the confidentiality measures the court implemented on November 1, 2019, in the Second Order and the Records Confidentiality Order.[393] The Respondents object to this amount. They contend, among other things, that the Custodian is not entitled to any of this amount "because the information was not confidential and it was improper all along for [the Custodian] to claim otherwise."[394]

When the court approved the confidentiality restrictions in the Second Order and the Records Confidentiality Order, it believed the restrictions were legally permissible[395] and were "necessary to prevent against the risk of misuse of this information . . . given instances of misconduct by Mr. Shawe that have been well

---

[393] Dkt. 1576 at 22.

[394] Dkt. 1571 at 34.

[395] *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984) (holding that "where . . . a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment"); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) ("It is uncontested . . . that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not used to gratify private spite or promote public scandal . . . ." (internal citation and quotation marks omitted)).

documented in these actions."[396]   The documented instances of misconduct in the

record at the time included the following:

- Actions Shawe took "in bad faith and vexatiously during the course of the litigation,"[397] which formed the basis for the court's imposition of a $7.1 million sanction against him.[398]

- An action Shawe filed in New York state court in 2016 against Elting and her counsel, which the court dismissed along with two other cases Ms. Shawe filed against Elting's financial advisor and husband, noting that the three cases were replete with "revisionist history" of the Delaware actions "that borders on downright frivolity."[399]

- An action Shawe filed against the Custodian in the United States District Court for the Southern District of New York, which reflected, "in my view, Shawe's displeasure with the Custodian's steadfast refusal to bend to his will during the sale process."[400]

- Shawe's misuse of billing records that Elting's Delaware counsel (Potter Anderson & Corroon) filed in these actions in support of a fee application for the purpose of filing a frivolous action against the firm and its lead litigation counsel (Kevin R. Shannon) in the United States District Court for the District of Delaware.  The district court dismissed the action and sanctioned Shawe and his counsel, noting that "Shawe's purpose in presenting the Court with the complaint and the amended complaint was to harass the Defendants and to abuse the court system, in violation of Rule 11(b)(1)."[401]

---

[396] Hr'g Tr. at 12 (Oct. 21, 2019) (Dkt. 1408).

[397] *Shawe & Elting, LLC*, 2016 WL 3951339, at *1.

[398] Dkt. 885 ¶ 13; *see supra* Part I.D.

[399] *Shawe*, 2017 WL 2882221, at *1; *see supra* Part I.E.

[400] *TransPerfect*, 2018 WL 904160, at *15.

[401] *Shawe*, 2017 WL 6397342, at *4.

- The filing of the Nevada Action in contempt of the Final Order.[402]

By January 2021, the situation had changed. On June 8, 2020, the court granted (with modifications) TPG's motion for an order clarifying the Second Order and Records Confidentiality Order.[403] In October 2020, the court unsealed all records that had been filed confidentially, except for Skadden's billing records.[404] On November 30, 2020, the court established a schedule to bring the custodianship to a close, which meant that a public hearing would be held in the near future to discuss, among other matters, the Custodian's fee petitions.[405] Given these circumstances, and the court's own review of many of the billing records at issue, the court entered an order on January 13, 2021, modifying the Second Order, rescinding the confidentiality restrictions in the Records Confidentiality Order, unsealing Skadden's billing records, and requiring that "any future fee petitions of the Custodian and/or his counsel and any Billing Records filed with the Court shall not be filed under seal."[406]

Given the circumstances described above, while reasonable minds can differ about who should bear the expense of implementing and fighting over the

---

[402] *TransPerfect*, 2019 WL 5260362, at *13.

[403] Dkt. 1495.

[404] Dkts. 1509, 1514.

[405] Dkt. 1524.

[406] Dkt. 1559 ¶ 4.

confidentiality restrictions in the Second Order and the Records Confidentiality Order that have now been lifted, the equitable result in the court's view is not to impose this expense on Respondents. Thus, Respondents' objection is sustained and the Custodian's request for reimbursement of $265,592 for the confidentiality motions and $60,000 for the Fee Orders attributable to the implementation of the confidentiality restrictions will be disallowed.[407]

### 4. The Contempt and Preclusion Motions

The Custodian seeks $274,887 for fees and expenses incurred in opposing Respondents' motions for contempt against the Custodian and motion to preclude the Custodian from recovering the Contempt Fee Award.[408] Respondents challenge the rates charged by certain timekeepers, descriptions in the billing records, and the propriety of charging for "internal" conferences.[409] Respondents contend that these "fees must be radically slashed to no more than 25% or $60,000"—an arbitrary figure that is not supported by any reasoned explanation.[410]

---

[407] This $60,000 stems from the approximately $74,470 within the Fee Orders for work on the Second Order and Records Confidentiality Order. Respondents contend that approximately 80% of this amount—or $60,000—relates to confidentiality matters. *See* Dkt. 1571 at 33-34. Having reviewed many of the entries at issue, the court agrees. For the reasons discussed in Part V.B.2 above, the court rejects Respondents' argument that $122,500 of the Custodian's fee petition for work on appeals should be reallocated to the "confidentiality motions" subject matter category.

[408] Dkt. 1576 at 22; Dkt. 1577 at 4.

[409] *See* Dkt. 1573 at 9-10.

[410] *Id.* at 10.

The objection is overruled. Respondents' objections rehash criticisms in Paige's reports and are without merit for the same reasons the court already has discussed in detail. More broadly, Respondents' objections are rejected as manifestations of the "pizza principle" discussed at the outset of this decision. The contempt and preclusions motions are easy "pizzas" to throw at the wall, but they take much more time to clean up with an appropriately prepared response, particularly in this case where the docket is massive (currently over 1,600 entries) and providing context is imperative. For the reasons discussed in Parts III and IV above, both motions are devoid of merit. The Custodian is entitled to recover the fees and expenses he and his counsel appropriately and reasonably incurred to clean up a mess of Respondents' own making.

### 5. The Cypress and H.I.G. Actions

The Custodian seeks reimbursement for fees and expenses incurred in responding to requests for deposition and document discovery in the Cypress and H.I.G. Actions totaling $30,920 and $280,013, respectively.[411] As to the H.I.G. Action, the "fees were incurred in responding to four subpoenas served on Pincus and Skadden," which required reviewing documents for privilege and potential production.[412] The work performed also required coordinating "with three of

---

[411] Dkt. 1441 at 14, 16; Dkt. 1576 at 23, 25; Dkt. 1577 at 6.

[412] Dkt. 1577 at 6.

Pincus's advisors in the sale process" who also received subpoenas and "analyzing potentially privileged communications in those advisors' possession."[413]

Respondents assert these fees are not recoverable because "nothing in the [Sale Agreement] or the Court's orders authorize Pincus or Skadden to charge either TPG or the Escrow for time spent on litigations in which they are non-parties."[414] The objection is overruled.

In my opinion, at least two provisions of this court's orders entitle the Custodian to receive payment for fees and expenses he and his counsel incurred in connection with the Cypress and H.I.G. Actions. First, paragraph 14 of the Sale Order provides that the Custodian "shall be reimbursed for reasonable travel and other expenses incurred in performance of his duties" and that the fees and expenses of the Custodian's "counsel or advisors shall be paid promptly by the Company."[415] The Sale Order broadly defines the scope of the Custodian's duties related to the sale process[416] and, as the court previously held, "the pleadings in [the Cypress and H.I.G.

---

[413] *Id.*

[414] Dkt. 1429 at 23.

[415] Dkt. 848 ¶ 14.

[416] For example, the Sale Order authorized the Custodian to, among other things (i) "establish any and all procedures and processes for the Modified Auction," (ii) "determine the winning bidder of the Modified Auction," (iii) "negotiate, draft and execute on behalf of the Company appropriate confidentiality agreements to be executed by any potential bidders," and (iv) "act through and in the name of the Company to carry out his duties." *Id.* ¶¶ 1, 3, 4, 9.

Actions] and Shawe's own explanation of them in his opposition indicates that they both relate to the sale process the Custodian was appointed to oversee."[417] Indeed, the focus of a subpoena issued to Pincus in the H.I.G. Action, which seeks 68 categories of documents, is on the "Auction," which is defined as "the sale of TransPerfect ordered by the Delaware Chancery Court in August 2015 and conducted by you, as the Custodian."[418]

Second, the Sale Order and the Final Order both entitle the Custodian and Skadden "to be indemnified by the Company (or its successor in interest) . . . to the fullest extent permitted by law."[419] Respondents have cited no authority suggesting it would be legally impermissible to indemnify Pincus for discovery-related expenses incurred as a non-party that stem directly from his role as the Custodian, and the court is aware of none. In fact, consistent with the broad entitlement to indemnification in the Sale Order and the Final Order, Respondents acknowledged that TPG is obligated to pay Pincus for post-closing litigation costs in the H.I.G. Action under these provisions: "With respect to the issue of fees, *this is covered by the indemnification provisions already in place*."[420] Pursuant to these provisions, furthermore, the Company paid Pincus $75,000 as reimbursement for some (but far

---

[417] *TransPerfect*, 2019 WL 5260362, at *11 (footnote omitted).

[418] Dkt. 1576 Ex. 3.

[419] Dkt. 848 ¶ 16; Dkt. 1243 ¶ 7.

[420] Dkt. 1576 Ex. 1 at 1 (emphasis added).

from all) of the expenses that were incurred in responding to discovery requests in the H.I.G. Action.[421]

### 6. Response to the Omnibus Objection

The Custodian seeks $605,793 for work performed in responding to Respondents' Omnibus Objection.[422] As an initial matter, the court observes that approximately $11,000 of the time entries in this category refer to the preparation of billing statements for submission to the court.[423] This amount will be excluded by allocating $7,190 of this amount to the $204,485 the Custodian withdrew from his overall request for preparing the fee petitions, with the remaining $3,810 allocated as an additional reduction. Thus, the amount at issue for responding to the Omnibus Objection is $594,793.

Respondents advance essentially two objections concerning the amount sought for responding to the Omnibus Objection. Because neither is meritorious, the objections are overruled.

First, Respondents contend that the entire amount sought is not recoverable "[b]ecause Skadden made no assertion that the Omnibus Objection was in bad

---

[421] Dkt. 1554 Ex. 1 at 5.

[422] Dkt. 1576 at 21.

[423] As an example, Timekeeper A billed 2.2 hours with the description "attention to billing records and preparation of submissions re: fee orders and prior submissions; confer with associate re: same" to this subject matter. Dkt. 1537 Ex. A.

faith."[424]  They base this argument on the first sentence from paragraph 3(e) of the Second Order quoted below, which states that the court may shift fees if either party is found to have acted in bad faith in connection with the fee petition/billing process:

> To the extent that any party is found to have acted in bad faith regarding the fee petition and objection process set forth in Paragraph 3(c) herein, the Court may order that such party pay fees and expenses incurred by the other party or parties in connection with the objection process at issue. *For the avoidance of doubt, any such order shall be in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement.*[425]

Significantly, the very next sentence in paragraph 3(e), italicized above, expressly provides that fee-shifting for bad faith is "in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement." By its terms, paragraph 3(e) was not intended to and plainly does not eliminate or modify any of the Custodian's pre-existing rights to recover fees and expenses under any court order, agreement, or other form of entitlement and, to the contrary, expressly preserved those rights. Thus, the Custodian had no obligation to demonstrate bad faith in order to recover fees and expenses for responding to the Omnibus Objection.

---

[424] Dkt. 1571 at 24.

[425] Dkt. 1399 ¶ 3(e) (emphasis added).

Respondents cite our Supreme Court's decision in *DCV Holdings, Inc. v. Conagra, Inc.*,[426] for the proposition that "[w]here there is both a general and a specific provision that pertains to the same subject, courts ordinarily qualify the meaning of the general provision according to the meaning of the more specific provision."[427] The Supreme Court's decision makes clear, however, that this interpretative principle applies only "where specific and general provisions conflict."[428] Here, the two sentences at issue do not conflict. The first sentence from paragraph 3(e) quoted above is intended to deter abuse in the fee petition process by putting *both* sides on notice that the court may shift fees for bad faith conduct[429]—a stigma any rational person would want to avoid. The second sentence makes it crystal clear—precisely to avoid any "doubt"—that the Custodian retained all of his rights to recover fees under this court's orders and other sources. Further,

---

[426] 889 A.2d 954 (Del. 2005).

[427] Dkt. 1571 at 23 (quoting *DVC Hldgs.*, 889 A.2d at 961).

[428] *DCV Hldgs.*, 889 A.2d at 961 (emphasis added); *see also ITG Brands, LLC v. Reynolds Am., Inc.*, 2019 WL 4593495, *9 (Del. Ch. Sept. 23, 2019) ("Finally, to repeat, our law provides that 'the specific provision ordinarily qualifies the meaning of the general one' in situations 'where specific and general provisions conflict.'" (*quoting DCV Hldgs.*, 889 A.2d at 961)).

[429] *RBC Cap. Mkts, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (explaining that the bad faith exception to the American Rule "is premised on the theory that when a litigant imposes unjustifiable costs on its adversary by bringing baseless claims or by improperly increasing the costs of litigation through other bad faith conduct, shifting fees helps to deter future misconduct and compensates the victim of that misconduct" (internal quotation marks omitted)).

113

Respondents' contention that the Custodian is barred from recovering fees and expenses incurred with respect to the Omnibus Objection would render meaningless the second sentence expressly preserving "the Custodian's right to recover such amounts pursuant to the Court's orders," contrary to bedrock principles of contract interpretation.[430]

Second, Respondents contend that, "[i]f the court determines that such fees are recoverable," they "should be reduced by at least 56% from $606,000 to $266,640" because the requested fees "are grossly unreasonable for a single 28-page brief in opposition."[431]  There is intuitive appeal to the notion that it is unreasonable to seek reimbursement for opposing an objection in an amount ($594,793) that is more than two times the amount of the underlying fee request ($242,886).  But this is where the "pizza principle" is salient.

Whether a coincidence or not, there is a good reason this objection is called the "Omnibus Objection."  It is because Respondents threw the kitchen sink at the

---

[430] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless." (internal quotation marks omitted)); *see also In re Trico Marine Servs., Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. Apr. 15, 2011) ("When construing an agreed or negotiated form of order, such as the Sale Order in this case, the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order."); *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) ("Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract.").

[431] Dkt. 1571 at 24, 26.

114

Custodian's fee petitions for May through October 2019 in the form of a 48-page brief, a 31-page report from their expert (excluding exhibits), and other materials.[432] Paige's report challenges Skadden's hourly rates; its billing for legal assistants and other non-attorney timekeepers; its billing to recover certain out-of-pocket expenses; and numerous other billing practices, which Paige scrutinizes using a seventeen-part "Tagging Guide." It took the court over 30 pages in this opinion to address this smorgasbord of issues and it understandably took the Custodian and Skadden "significant time parsing through the sprawling [objection] and researching the applicable law"[433] in order to drill down on all the issues and defend itself appropriately.[434]

As previously explained, Respondents contend that the fees sought in Skadden's petitions should be cut by approximately 56% based on all the criticisms detailed in Paige's report.[435] Because the court has rejected all of these criticisms, with one minor exception relating to less than $17,000 of administrative expenses, there is no basis for rejecting the Custodian's request to be reimbursed for the fees

---

[432] *See* Dkt. 1429.

[433] *Fitracks*, 58 A.3d at 999.

[434] Respondents inaccurately minimize the work the Custodian and Skadden performed, arguing that "the requested fees should be significantly reduced as they are grossly unreasonable for a single 28-page brief in opposition." Dkt. 1571 at 24. The Custodian's answering brief to the Omnibus Objection was 47 pages (not 28)—a relatively restrained length given the number of arguments placed at the Custodian's feet. *See* Dkt. 1441.

[435] Dkt. 1571 at 26.

and expenses he and his counsel reasonably had to incur to defend themselves, even though that amount exceeds the underlying fee request.

### 7. Update Letters

In his fee petitions, the Custodian originally sought $121,935 for fees and expenses related to preparing monthly update letters and fee petitions that were submitted to the court after May 2019.[436] The court has excluded this entire amount as part of the Custodian's withdrawal of $204,485 from his overall fee request to moot the dispute over seeking reimbursement for fees and expenses incurred in preparing fee petitions.[437] The chart attached as Exhibit A reflects this reduction.

Separately, the Custodian seeks $23,063 for fees and expenses incurred in connection with preparing a 12-page letter that was filed with the court along with various attachments on May 8, 2019.[438] The letter informed the court about the filing of the Cypress and H.I.G. Actions, described the nature of the allegations therein, and apprised the court that the Custodian and Skadden had received "Litigation Hold Notices" with respect to the H.I.G. Action and that the Custodian had been informed

---

[436] *See* Dkt. 1441 at 22; Dkt. 1576 at 25; Dkt. 1577 at 4.

[437] *See* Dkt. 1592 at 4 n.2 (explaining that "all of the costs related to his fee petitions and/or update letters submitted to the Court after August 2019 [*i.e.*, $103,124]," were included as part of the withdrawn amount), 5 n.3 (explaining that an additional "$15,631.25 related to the months of September and October 2019 was incurred for preparing fee petitions and allocating fees").

[438] Dkt. 1315 Ex. 1.

116

that discovery would be sought from him in the Cypress Action as well.[439] The Custodian also explained that, under the circumstances and based on the nature of the litigations, he intended to seek payment "in future applications" directly from TPG for expenses he would be forced to incur in connection with those litigations, "while reserving all rights vis-à-vis the Escrow Fund."[440]

During the course of these actions, the court entered two orders requiring the Custodian to provide updates to the court on a monthly basis. Although that formal obligation appears to have ended when the sale transaction closed,[441] it was entirely within the Custodian's discretion as part of his duties as an officer of the court to provide the court with the update contained in the May 8, 2019 letter. Indeed, the court would have expected nothing less. For this reason, the court approves the Custodian's request for reimbursement of the fees and expenses incurred in connection with providing the May 8, 2019 update to the court. This amount ($23,063) will be paid out of the Escrow.

---

[439] *See id.*

[440] *Id.* at 10-11.

[441] *See* Dkt. 607 ¶ 8 ("The Custodian shall provide a report to the Court concerning a proposed plan of sale as promptly as practicable after the Court receives confirmation of his willingness to serve as Custodian, and shall provide a report to the Court every thirty days after entry of this Order concerning the progress of his efforts."); Dtk. 848 ¶ 17 ("During the sale process, the Custodian shall file under seal with the Court monthly updates generally addressing the progress of the sale process . . . .").

### 8. Discharge of the Custodian

The Custodian seeks $136,425 for fees and expenses incurred in connection with analyzing, researching, and drafting the proposed discharge order and related motion, which included addressing inquiries from Elting's counsel regarding the proposed discharge order.[442] Respondents do not contest the Custodian's right to be reimbursed for fees and expenses incurred in connection with the discharge, but challenge the amount of fees sought as "grossly unreasonable."[443] According to Respondents, "a far shorter, straightforward petition" than the one the Custodian proposed "was all that was necessary and proper."[444]

In its letter decision resolving the parties' disputes over the discharge order, the court found that the one-paragraph form of order the Respondents proposed was "inadequate for the task."[445] The court further explained that a "more nuanced discharge order [was] necessary to provide clarity on the terms of the discharge" because of "the lengthy and fractious history of these actions, the numerous (and often frivolous) collateral litigations spawned from the sale process that have

---

[442] Dkt. 1577 at 3.

[443] Dkt. 1573 at 11.

[444] *Id.*

[445] *In re TransPerfect Glob., Inc.*, 2021 WL 1401518, at *1 (Del. Ch. Apr. 14, 2021).

embroiled the Custodian and many others, and the complexity of the issues involved."[446]

The only issue for decision is what percentage of the amount of fees and expenses the Custodian seeks in connection with his discharge application should be awarded. Using the comprehensive form of order the Custodian submitted as a starting point, the court addressed Respondents' objections paragraph-by-paragraph and prepared a revised form of order.[447] As the end product reflects, the court found that most of the provisions the Custodian sought were appropriate—indeed many were not opposed specifically—but also found that some of them were not appropriate.[448] Having gone through that process in laborious detail, the court concludes that the Custodian should receive two-thirds, or $90,950, of the fees and expenses sought from the Escrow and that the remainder ($45,475) will be disallowed.

### 9. Other Categories

The remaining four categories involve a total of $136,353 for fees and expenses incurred working on tax matters, preparing for the Second Objection and

---

[446] *Id.* (citation omitted).

[447] *See id.* at *2-3.

[448] *See id.* at *2 (explaining that the deletion of certain paragraphs in the Custodian's proposed order of discharge was necessary "to avoid confusion over the scope of the pre-existing protections"); Dkt. 1601.

objections to the Custodian's discharge order, certain document demands from TPG, and miscellaneous items. They are addressed, in turn, next.

Tax Matters. The Custodian seeks reimbursement from the Escrow for $67,590 of fees and expenses for tax matters.[449] Respondents did not address and thus waived the right to object to $26,487 of this amount for work performed during the November 2019 to November 2020 period,[450] $19,800 of which is sought on behalf of Ernst & Young.[451] With respect to the balance ($41,103), which concerns the May 2019 to October 2019 period, the work involved a dispute between Shawe and Elting concerning their rights under a letter agreement executed at closing, which had tax implications for them relating to TPG's 2018 tax returns.[452]

Respondents' primary challenge is that the time entries are vague or repetitive.[453] Based on the Custodian's detailed explanation of the dispute and the work performed,[454] and Respondents' apparent failure to meet and confer on the issue in good faith before filing their objection,[455] the court is satisfied that the

---

[449] Dkt. 1441 at 11; Dkt. 1576 at 23.

[450] *See* Dkt. 1571 at 59 n.31.

[451] Dkt. 1576 at 23.

[452] Dkt. 1441 at 11-13 & Exs. 7-12.

[453] *See* Dkt. 1429 at 45-46; Dkt. 1451 at 25.

[454] *See* Dkt. 1441 at 11-13 & Exs. 7-12.

[455] *Id.* at 13 & Ex. 4.

amount sought is appropriate.[456] Accordingly, the objection is overruled and the full amount will be paid from the Escrow.

Anticipated Objections. The Custodian seeks $49,589 in fees and expenses for work done in December 2020 concerning objections he and his counsel anticipated would be made to certain fee petitions and to the discharge motion.[457] This category also includes work done in connection with "proposing a fee compromise" to settle the parties' fee petition disputes.[458] Respondents assert two objections.

First, Respondents assert that "Skadden is not entitled to these fees because Pincus failed to claim, let alone establish, that TPG or Shawe acted in bad faith as required by the Second Order."[459] This is objection is overruled. As explained in Part V.B.6, the Custodian is entitled to seek reimbursement and/or indemnification for fees and expenses under the terms of the court's orders without having to demonstrate that Respondents acted in bad faith. Given the numerous and sweeping nature of the objections Respondents had filed in response to prior fee petitions, furthermore, it was reasonable as a general matter for the Custodian and his counsel to spend time preparing in advance to address objections they anticipated

---

[456] *Id.* at 11-13 & Exs. 7-12.

[457] Dkt. 1577 at 5.

[458] *Id.*

[459] Dkt. 1573 at 10.

121

Respondents would raise with respect to future fee petitions and the discharge motion.[460]

Second, the Respondents challenge $11,500 of fees Skadden incurred in connection with making a settlement offer that, according to Respondents, "Skadden knew . . . would be rejected outright."[461] Having reviewed the time entries at issue, this objection is sustained. Although the court certainly encourages parties to make every effort to reach amicable resolutions of disputes, the court does not believe that, in effect, one party to a dispute should charge the counterparty for time spent pursuing a settlement between the two.

Apart from Respondents' objections, the court observed in reviewing the time entries in this category a Westlaw charge incurred on December 28, 2020 for $20,497.50, apparently for research an associate conducted on that date for 5.6 hours.[462] This charge (perhaps a mistaken entry) is a significant outlier from other Westlaw charges in the billing records[463] and will reduced by 90%, or $18,448.

---

[460] *See Lillis*, 2009 WL 663946, at *7 (ruling that "research time expended . . . in expectation of an appeal" was "reasonable in preparation for the appellate argument that was expected to, and in fact did, come").

[461] Dkt. 1573 at 11.

[462] Dkt. 1555 Ex. A.

[463] *See* Dkt. 1441 App. A; Dkt. 1537 Ex. A; Dkt. 1555 Ex. A.

In sum, for the reasons explained above, $29,948 of the amount sought for "anticipated objections" will be disallowed, leaving a balance of $19,641 that will be allowed.

TPG Document Demands. The Custodian seeks $16,856 for work arising from document demands TPG sent to the Custodian's advisors (Credit Suisse and Alvarez & Marsal), who then contacted the Custodian.[464] "At the Custodian's request, Skadden reviewed the relevant contracts, court records and law, and prepared a written response."[465]

Respondents do not contest the Custodian's right to be reimbursed for fees and expenses incurred for this purpose but contend in conclusory fashion that the amount is "unreasonable" and should be reduced in accordance with "the Paige Report analysis."[466] Because the court has rejected that analysis, with one minor exception not relevant here, the objection is overruled and the full amount will be allowed.

Miscellaneous. The Custodian seeks $2,318 for less than 3 hours of time spent dealing with miscellaneous matters, including review of a U.S. Department of Justice complaint against TPG after the Custodian was contacted by a reporter

---

[464] Dkt. 1441 at 18.

[465] *Id*. at 19.

[466] Dkt. 1429 at 46-47.

($1,112) and time spent addressing a request from TPG's general counsel for a report Ernst & Young prepared during the sale process.[467] Respondents do not contest $1,207 of this amount. Respondents do contest the amount sought for the Department of Justice matter,[468] which the court will allow because it was reasonable for the Custodian to spend a brief amount of time (1.17 hours) looking into a matter that, according to Respondents, occurred during the custodianship. This amount will be paid from the Escrow.

* * * * *

In sum, most of Respondents' general and specific objections are without merit. Taking into account the objections that are sustained, the court finds that the Custodian is entitled to fees and expenses totaling $3,242,251. The court has evaluated this amount considering each of the Rule 1.5(a) factors and concludes it is reasonable in light of, among other things, the extensive time and labor required over the roughly twenty months at issue, the results obtained, the time limitations imposed on the Custodian and his counsel by Respondents, and the reputation and ability of the Custodian and the attorneys at Skadden.

---

[467] Dkt. 1441 at 21.
[468] Dkt. 1429 at 47.

124

## C. Source of Payment

For the reasons discussed above, and as reflected on the chart attached as Exhibit A, payments are owed for fifteen of the eighteen subject matter categories. The court already has ordered that TPG and Shawe must pay the Contempt Fee Award.[469] The court determined in Part V.B. that five categories should be paid from the Escrow.

The parties disagree over the source of payment for the remaining nine categories: (i) fee order violations, (ii) appeals, (iii) contempt and preclusion motions, (iv) Cypress Action, (v) H.I.G. Action, (vi) response to omnibus objection, (vii) anticipated objections, (viii) TPG document demands, and (ix) other TPG litigations. The Custodian contends that the payment for these categories should come from TPG. Respondents contend that, if any payment is owed for these categories, it must come from the Escrow.

To be more specific, Respondents assert in their Omnibus Objection that the fees and expenses sought by the Custodian for the Cypress and H.I.G. Actions should come from the Escrow, not TPG directly, because "there is no reason Elting should not share in the costs via the Escrow," as she "is not blameless in the events leading to the [H.I.G.] litigation" and "the Custodian's decision to bill TPG, not the Escrow,

---

[469] Dkt. 1399 ¶ 7 (modifying Dkt. 1379 ¶ 4).

for the Litigations is inconsistent and arbitrary."[470]  Respondents further assert in their Second Objection that this argument is "equally applicable to all other fees currently sought against TPG," contending that "this Court has already ruled that Pincus' fees in connection with litigation arising from the sale of TPG must be charged to the Escrow."[471]

In my opinion, Respondents' contention that the Custodian *must* seek his fees and expenses from the Escrow is without merit.  Nothing in this court's orders or the Sale Agreement requires that the Custodian seek fees and expenses from the Escrow.

The compensation provision in the Initial Order and the August 2015 Order both expressly state that: "Any fees and expenses approved by the Court shall be paid promptly *by TPG*."[472]  The compensation provision in the Sale Order does likewise:  "Any fees and expenses approved by the Court shall be paid promptly *by the Company*."[473]  Additionally, the Initial Order, the August 2015 Order, the Sale Order, and the Final Order each expressly provide that the Custodian and Skadden "are entitled to judicial immunity and to be indemnified" *by the Company*, "in each case, to the fullest extent permitted by law."[474]

---

[470] Dkt. 1429 at 30-31.

[471] Dkt. 1571 at 38.

[472] Dkt. 515 ¶ 7 (emphasis added); Dkt. 607 ¶ 10 (emphasis added).

[473] Dkt. 848 ¶ 14 (emphasis added).

[474] Dkt. 515 ¶ 6; Dkt. 607 ¶ 9; Dkt. 848 ¶ 16; Dkt. 1243 ¶ 7.

Turning to the Sale Agreement, it expressly provides that Shawe "acknowledges and agrees that nothing in this Agreement shall limit the indemnification obligations of any Person and its Affiliates under the Order."[475] Consistent with this covenant, the Sale Agreement *does not require* that the Custodian seek fees and expenses to which he is entitled from the Escrow. To the contrary, Section 2.2 of the Sale Agreement expressly provides that the "Custodian Escrow Amount"—which was funded equally by Elting and Shawe—is "a non-exclusive source of funds" from which the Custodian may draw:

> The Escrow Amount shall be comprised of the following: . . . (b) five million dollars ($5,000,000) *as a non-exclusive source of funds* for securing (i) *amounts payable to the Custodian or his advisors,* including, without limitation, investment banking, legal and accounting fees and expenses *for services performed prior to or after the Closing* and (ii) any payments required to be made by the Company or any of the Company Subsidiaries to any current or former employee or officer of the Company or any Company Subsidiary after the Closing as a result of the transactions contemplated by this Agreement pursuant to any agreement or arrangement entered into with any such current or former employee or officer by the Custodian (on behalf of the Company or the applicable Company Subsidiary), including any retention, change in control or similar agreement or arrangement (the "Custodian Escrow Amount").[476]

---

[475] Dkt. 1185 Ann. C § 7.5(c).

[476] *Id.* § 2.2 (emphasis added). Respondents' argument that paragraph 9 of the Sale Order *requires* that the Custodian's fees and expenses be shared equally by Shawe and Elting is without merit. Dkt. 1571 at 39. That paragraph provides, in relevant part, that "any liability relating to the representations, warranties and covenants (and other related indemnities) and other indemnification obligations *set forth in the Definitive Sale Agreement* shall be shared by all stockholders pro rata." Dkt. 848 ¶ 9 (emphasis added). Nothing about paragraph 9, which is expressly limited to those obligations "set forth in the Definitive Sale

127

In short, to repeat, nothing in the Sale Agreement or this court's orders requires that the Custodian seek fees and expenses from the Escrow. Instead, determining as between the Escrow and the Company the source from which fees and expenses owed to the Custodian should be paid is a matter for the Custodian to determine in his good faith judgment.

Respondents argue there is an inconsistency between, on the one hand, the Custodian contending—and the court finding[477]—that the Cypress and H.I.G. Actions "relate to the sale process" and, on the other hand, the Custodian making the judgment that the Company should pay bear the cost of the fees and expenses he and his counsel incur in connection with those litigations rather than the Escrow.[478] The court disagrees.

To be sure, both litigations relate to the sale process in certain respects. In the H.I.G. Action, for example, the discovery sought from the Custodian is directed to exploring H.I.G.'s access to TPG information during that process.[479] But that does

---

Agreement," eliminates the Custodian's continuing right to be indemnified by and seek payment of his fees and expenses from the Company under the orders of this court.

[477] *See TransPerfect*, 2019 WL 5260362, at \*11 (explaining that the pleadings in the Cypress and H.I.G. Actions "and Shawe's own explanation of them in his opposition indicates that they both relate to the sale process the Custodian was appointed to oversee and not to his role as a tie-breaking director").

[478] *See* Dkt. 1451 at 13.

[479] *See* Dkt. 1576 Ex. 3.

not mean that Elting has or had a proximate role in the events at the heart of either litigation—both of which were filed more than one year after sale transaction closed in May 2018—sufficient as an equitable matter to warrant imposing on her 50% of the discovery-related expenses the Custodian incurred related to those litigations. Indeed, in my view, the circumstances of those litigations support the Custodian's judgment that Elting should not bear the cost of those expenses as an equitable matter.

The Cypress Action, which was filed in May 2019 and has since been resolved,[480] concerned a dispute between Shawe and a financial advisor (Cypress) he retained during the course of the sale process. Cypress contended that Shawe breached his obligation "to pay Cypress a 'Financing Fee' of $1 million (less a previously paid retainer of $200,000), on the closing date of the Transaction."[481] That was a fight between Cypress and Shawe. Elting was not named as party in the litigation and did not stand to receive any benefit from the litigation.

In April 2019, TPG sued H.I.G. and its majority-owned subsidiary (Lionbridge) seeking over $300 million in damages for allegedly misusing TPG trade secrets or confidential information that H.I.G. acquired during the sale process

---

[480] *See* Dkt. 1473 Ex. 1.

[481] Dkt. 1315 Ex. 1 Attach. A ¶ 22.

to compete unfairly with the Company.[482]  The relief sought in the H.I.G. Action only would benefit TPG.  Once again, Elting is not a party to the H.I.G. Action and stands to receive no benefit from the litigation.

Elting also had no proximate role in any of the other seven subject matter categories for which the Custodian seeks payment from TPG sufficient to warrant imposing on her 50% of the expenses the Custodian and his counsel have incurred in those matters.  All of those matters concern post-closing decisions or actions of TPG while under Shawe's 99% ownership that have no apparent connection to Elting.  Rather, their common denominator appears to be Shawe's self-proclaimed *modus operandi* to "create constant pain" for those who oppose him.[483]

For example, three of the categories—Fee Order violations, appeals, and the contempt and preclusion motions TPG filed against the Custodian—stem from *TPG*'s refusal in 2019 to pay amounts it was ordered to pay under the Fee Orders and its decision in August 2019 to sue the Custodian concerning those amounts in Nevada state court in violation of the exclusive jurisdiction provision in the Final Order.[484]  Two other categories—omnibus objections and anticipated objections— concern *TPG*'s decision to challenge in a scorched-earth manner every fee petition

---

[482] Dkt. 1315 Ex. 1 Attach. B at 1 (¶ 1), 43 (¶ h).

[483] *Shawe & Elting*, 2015 WL 4874733, at *6.

[484] *See TransPerfect*, 2019 WL 5260362, at *7-8.

130

of the Custodian since May 2019. The remaining two categories concern document requests *TPG* propounded on the Custodian's financial advisors in August 2019, and litigations *the Company* filed against RAM and Moritz in August 2020 and against this judicial officer on December 24, 2020.

In sum, for the reasons explained above, the court agrees with the Custodian that the fees and expenses he and his counsel incurred in connection with the nine subject matter categories listed at the beginning of this section should be paid by TPG. The chart attached as Exhibit A identifies for each of the fifteen categories at issue the source of payment for the amounts owed.

## VI. THE BAD FAITH MOTION

On March 2, 2021, Respondents filed a filed a motion for an award of attorneys' fees in their favor and against the Custodian for his alleged bad faith in the fee petition process.[485] Specifically, Respondents contend that the Custodian acted in bad faith by (i) seeking "$425,126.87 in fees for the Fee Orders portion of the Motion for Contempt in direct violation of this Court's order declining to award those fees," (ii) requesting "more than $700,000 for fees concerning the fee petition process without first establishing bad faith, as required," and (iii) "charging more

---

[485] Dkt. 1589.

than $204,000 for preparing the deficient December Petition after refusing to file monthly petitions for over a year."[486]

The bad faith exception to the American Rule that each party pays his or her own attorneys' fees "applies only in extraordinary cases," such as where a party "unnecessarily prolonged or delayed litigation, falsified records, . . . knowingly asserted frivolous claims . . . misled the court, altered testimony, or changed position on an issue."[487] The exception does not apply here. Indeed, Respondents' assertions that the Custodian acted in bad faith are frivolous in my view.

Respondents' first and second arguments are meritless for the same reasons detailed above in Part V.B.1 and Part V.B.6. To summarize, nothing in the Second Order implementing the court's October 21, 2019 transcript ruling (i) precluded the Custodian from seeking to recover fees and expenses incurred with respect to TPG's violations of the Fee Orders or its objections to the Custodian's fee petitions under the reimbursement and indemnification provisions in the court's prior orders or (ii) required the Custodian to prove bad faith as a predicate to seeking reimbursement of such fees.

To the contrary, the October 21 ruling was intended to leave undisturbed the court's October 17, 2019 holding that the Custodian's right to recover the Contempt

---

[486] *Id.* at 2.

[487] *RBC Cap. Mkts.*, 129 A.3d at 877 (cleaned up).

Fee Award *as a sanction* was "without regard to whatever rights the Custodian has to recover these amounts under this court's orders and/or the Sale Agreement."[488] This is documented in paragraph 3(e) of the Second Order, which implemented the October 21 ruling. That paragraph expressly states that the reciprocal bad faith fee-shifting provision therein applies "in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement."[489] Thus, as paragraph 3(e) makes clear, the Custodian had no obligation to demonstrate bad faith as a predicate to seeking fees incurred with respect to TPG's violations of the Fee Orders or Respondents' voluminous objections to his fee petitions.[490]

---

[488] *TransPerfect*, 2019 WL 5260362, at *15.

[489] Dkt. 1399 ¶ 3(e).

[490] In support of their motion, Respondents attach a report from W. Bradley Wendel, a Cornell Law School professor. In his report, Wendel opines generally about how Skadden, as counsel to the Custodian "owes duties to the beneficiary of the Custodian's fiduciary obligations," before concluding summarily that "Skadden has not acted in good faith in its dealings with TPG." Dkt. 1590 Ex. B ¶¶ 3,10. These opinions constitute recitations of the law and legal conclusions, which is not the proper role of an expert. *See In re Maxus Energy Corp.*, 2021 WL 1259411, at *8 n.62 (Bankr. D. Del. Apr. 6, 2021) ("Importantly, however, the Court finds that Professor Wendel's declarations consist entirely of a recitation of the law and legal conclusions. While thorough and informative in the general sense, this is not the proper role of expert testimony. The Court need not apply expert testimony to reach its own conclusions as to the law. Indeed, it should not.") (citing *Kansas v. Colorado*, 1994 WL 16189353, at *155 (1994) ("Opinion testimony providing legal conclusions is not admissible.")); *see also United Rentals, Inc. v. RAM Hldgs., Inc.*, 2007 WL 4465520, at *1 (Del. Ch. Dec. 13, 2007) ("This Court, however, has made it unmistakably clear that it is improper for witnesses to opine on legal issues governed by Delaware law. It is within the exclusive province of this Court to determine such issues of domestic law." (footnotes omitted)). Thus, the court does not credit these opinions.

As to the third issue, the court stated in its March 15, 2021 order establishing a briefing schedule that the parties' "response and reply need not address the issue" because it was "moot" given the Custodian's withdrawal of $204,485 of his fee request that, according to Respondents, related to the preparation of fee petitions.[491] Consistent with that direction, Respondents did not address the issue in their reply brief but stated they "reserve all rights."[492]

To be clear, on the merits, the Custodian—when first seeking to recover fees incurred in preparing certain fee petitions—cited authorities where this court permitted such applications.[493] Indeed, Respondents' own expert opines that "perhaps some reasonable amount may be charged to a client for preparing invoices."[494] As such, the court cannot conceive how bad faith could be shown here, particularly after the Custodian withdrew the application to moot the dispute.

Respondents' bad faith motion hereby is denied.

## VII. CONCLUSION

For the reasons explained above, Respondents' contempt, preclusion, and bad faith motions are all denied. The Objections are overruled in part and sustained in

---

[491] Dkt. 1596.

[492] Dkt. 1598 at 6 n.3.

[493] *See* Dkt. 1441 at 28-29 (citing *Papastavrou v. Stage III Techs., LLC*, 2013 WL 269120 (Del. Ch. Jan. 23, 2013) (ORDER) and *All Pro Maids, Inc. v. Layton*, 2004 WL 3029869, at *6 (Del. Ch. Dec. 20, 2004), *aff'd,* 880 A.2d 1047 (Del. 2005)).

[494] Dkt. 1590 Ex. B ¶ 19.

part. The Custodian shall be paid his reasonable fees and expenses, totaling $3,242,251, in the manner set forth in the chart attached as Exhibit A and in accordance with the implementing order that accompanies this decision.

| | Subject Matter | Initial Amount Sought[1] | Admin. | Amount at Issue | Reduction | Balance | Payor TPG/Shawe | TPG | Escrow |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Contempt Fee Award | $1,174,541 | $26,250 | $1,148,291 | $0 | $1,148,291 | $1,148,291 | | |
| 2 | Fee Order Violations | $425,127 | $0 | $425,127 | $60,000 | $365,127 | | $365,127 | |
| 3 | Appeals | $336,128 | $0 | $336,128 | $0 | $336,128 | | $336,128 | |
| 4 | Confidentiality Motions | $265,592 | $0 | $265,592 | $265,592 | $0 | --- | --- | --- |
| 5 | Contempt and Preclusion Motions | $274,887 | $0 | $274,887 | $0 | $274,887 | | $274,887 | |
| 6 | Cypress Action | $30,920 | $0 | $30,920 | $0 | $30,920 | | $30,920 | |
| 7 | HIG Action[2] | $280,013 | $0 | $280,013 | $0 | $280,013 | | $280,013 | |
| 8 | Response to Omnibus Objection | $605,793 | $7,190 | $598,603 | $3,810 | $594,793 | | $594,793 | |
| 9 | Fee Petitions and Update Letters | $121,935 | $121,935 | $0 | $0 | $0 | --- | --- | --- |
| 10 | Fee Petitions re: Contempt Motion | $49,110 | $49,110 | $0 | $0 | $0 | --- | --- | --- |
| 11 | May 2019 Update Letter | $23,063 | $0 | $23,063 | $0 | $23,063 | | | $23,063 |
| 12 | Discharge of Custodian | $136,425 | $0 | $136,425 | $45,475 | $90,950 | | | $90,950 |
| 13 | Tax Matters[3] | $67,590 | $0 | $67,590 | $0 | $67,590 | | | $67,590 |
| 14 | Anticipated Objections | $49,589 | $0 | $49,589 | $29,948 | $19,641 | | $19,641 | |
| 15 | TPG Document Demands | $16,856 | $0 | $16,856 | $0 | $16,856 | | $16,856 | |
| 16 | Miscellaneous | $2,318 | $0 | $2,318 | $0 | $2,318 | | | $2,318 |
| 17 | Other TPG Litigations | $5,478 | $0 | $5,478 | $0 | $5,478 | | $5,478 | |
| 18 | Escrow Matters | $3,000 | $0 | $3,000 | $0 | $3,000 | | | $3,000 |
| | **Total** | $3,868,363 | $204,485[4] | $3,663,878 | $404,825 | $3,259,054 | $1,148,291 | $1,923,842 | $186,921 |
| | **General Objection Reduction** | | | | $16,803 | $16,803 | | $16,803 | |
| | **Final Calculation** | | | | $421,628 | $3,242,251 | $1,148,291 | $1,907,039 | $186,921 |

[1] All numbers rounded to the nearest dollar. Totals reflect non-rounded inputs.

[2] Excludes $75,000 paid by TPG. Dkt. 1576 at 25 n.11.

[3] Includes $19,800 for Ernst & Young. Dkt. 1576 at 23.

[4] This amount reflects the allocation of the $204,485 the Custodian withdrew from his initial request. Dkt. 1592 at 5.